**JFC INVESTORS LTD., d/b/a Fuel City, Plaintiff,**

**v.**

**GULF PRODUCTS DIVISION OF BP OIL, INC., Defendant.**

**JAXON PETROLEUM LTD. d/b/a Catawba Auto Truck Plaza, Plaintiff,**

**v.**

**GULF PRODUCTS DIVISION OF BP OIL, INC., Defendant.**

**Nos. C–C–85–270–P, C–C–85–271–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

May 9, 1985.

Robert J. Bernhardt, Charlotte, N.C., for plaintiff.

James H. Kelley, Jr., F. Joseph Treacy, Jr., Petree, Stockton, Robinson, Vaughn, Glaze & Maready, Winston-Salem, N.C., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

On April 17, 1985, Plaintiff, JFC Investors, Ltd., d/b/a Fuel City ("JFC") and Plaintiff Jaxon Petroleum Ltd., d/b/a Catawba Auto Truck Plaza ("Jaxon") instituted two separate actions seeking damages, and preliminary and permanent injunctive relief as a result of alleged violations of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq.* by the Defendant, Gulf Products Division of BP Oil, Inc. ("Gulf/BP").

Although there are two separate lawsuits the terms of the franchise contracts and the facts giving rise to the alleged violations of the PMPA are identical. Accordingly, a consolidated hearing on both Plaintiffs' motions for a preliminary injunction was held on April 29, 1985. The Plaintiffs were represented by Robert J. Bernhardt. The Defendant was represented by James H. Kelly, Jr., F. Joseph Treacy, Jr., and Roderick C. MacKinnon.

After carefully considering the evidence submitted, which evidence was largely uncontested, the legal memoranda and the arguments of counsel, the Court enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

Plaintiff JFC operates a Gulf branded retail truck stop on Interstate 77 near Charlotte, North Carolina pursuant to a written Dealer Agreement (the franchise agreement) dated January 1, 1980. JFC either owned or leased from someone other than Gulf the truck stop and the petroleum dispensing equipment located at the station.

Plaintiff, Jaxon, operates a Gulf branded retail truck stop on Interstate 40 near Catawba, North Carolina. Jaxon operates this truck stop pursuant to a written Retail Dealer's Agreement (the franchise agreement) with Gulf Oil Corporation executed on August 27, 1981. Jaxon either owned or leased from someone other than Gulf their truck stop and the petroleum dispensing equipment.

Jaxon and JFC were under common management with Jim Maner as President and Ralph Clark as Executive Vice-President.

In 1984 Chevron Corporation purchased Gulf Oil Corporation. As part of this purchase the Federal Trade Commission ordered Gulf/Chevron to divest itself of certain assets, including its marketing assets in North Carolina.

In the fall of 1984, Gulf/Chevron announced that it had agreed to sell its marketing assets in North Carolina to BP Oil, Inc. (Gulf/BP).

Plaintiffs were notified of this pending sale and were further notified that Gulf/Chevron would be assigning their contracts to Gulf/BP and that such contracts would remain in full force and effect. In the middle part of January 1985, Plaintiffs were notified that the changeover from Gulf/Chevron to Gulf/BP would take place effective February 1, 1985.

On February 1, 1985 Gulf/Chevron assigned to Gulf/BP the dealer contracts of Plaintiffs with Gulf/Chevron.

Both Jaxon and JFC contracts with Gulf provide in pertinent part:

*If at any time* the financial responsibility of purchaser shall become impaired or unsatisfactory to seller, or should purchaser be in arrears in his account with seller, seller may require, as a condition of making further deliveries under this contract, payment by purchaser of all past due accounts and *cash payment for all future deliveries.*"

Terms of payment—Cash on delivery or as approved by seller.

\* \* \* \* \* \*

Purchaser agrees not to engage in or permit any illegal or improper act or conduct, on or about the premises where Gulf identification is displayed and Gulf brand products are sold, which is detrimental to seller or any member of the public.

\* \* \* \* \* \*

*Purchaser hereby acknowledges that Gulf indicia,* including without limitation, Gulf trademarks, Gulf servicemarks, displays, symbols, color arrangement and other words and devices which identify Gulf Oil Corporation, its products, services and goodwill, are *valuable property rights belonging exclusively to Gulf Oil Corporation.* Any use of such Gulf indicia by purchaser, including use of stationery, invoices, delivery tickets, equipment, in directory or other advertising and the like in connection with this Agreement *is solely for the purpose of advertising the product and/or services of Gulf Oil Corporation.*

\* \* \* \* \* \*

Third: Said equipment shall be used solely for the storage, handling and advertising of petroleum products purchased by the party of the second part from the party of the first part, and any other use of said equipment shall be a breach of this contract, *justifying immediate cancellation* thereof by the party of the first part, in which event the party of the first part shall have the right to immediately enter upon said premises and remove said equipment, and every party thereof, without liability to the party of the second part for damages, direct or incidental, resulting from such removal.

\* \* \* \* \* \*

Seventh: Said party of the second part may use the Gulf trademarks, brand names, and color schemes to identify and advertise Gulf branded products at his location in connection with any of the above-listed equipment; *however, party of the second part shall not sell under Gulf's identification, trademarks, or brand names any product not bearing the Gulf brand or any mixture or adulteration of any Gulf branded products with each other or with any other product or material.* Upon request, the party of the first part shall have the right to enter the premises for the purpose of taking and recording the volume meter readings on any of the above equipment through which Gulf branded products are dispensed. [Emphasis supplied].

Since as early as 1982, both JFC and Jaxon have been experiencing financial difficulties. Jaxon and JFC management have been attempting since 1983 to find other investors to refinance and restructure the businesses.

Some time before 1984 Gulf began requiring both JFC and Jaxon to deliver by courier to the Gulf terminal in Paw Creek the credit card slips, cash and company checks which would be utilized to purchase petroleum products. Upon receipt of such payments at the Gulf terminal, Gulf would allow the Plaintiffs to purchase their fuel. Monies received prior to shipment of the gasoline products by Gulf were applied to the oldest invoices owed by Jaxon and JFC under a "1/10, net 30" payment system.

Immediately prior to the February 1, 1985 transfer to Gulf/BP, JFC and Jaxon owed Gulf/Chevron approximately $525,000.00. This debt remained an asset of Gulf/Chevron and was not transferred to Gulf/BP.

Gulf/BP management began in the middle part of January 1985, reviewing the credit worthiness of all of the dealers it was taking assignments of contracts from Gulf/Chevron. Ronnie Manton who was to assume responsibilities of District Manager of Gulf/BP in North Carolina, specifically reviewed the Plaintiffs' past credit history with Gulf/Chevron and spoke with the field marketing personnel regarding the continuing financial restructuring of the Plaintiffs. Based on this investigation Mr. Manton decided that Gulf/BP would only do business with the Plaintiffs on a COD/cash basis.

On January 27, 1985 Mr. Manton contacted Larry Baucom, the Retail Marketing Representative for Gulf/BP in the Charlotte, North Carolina area, and asked him to inform Plaintiffs that effective February 1, 1985, Gulf/BP would be supplying product to them and that such product would have to be paid for by the Plaintiffs on a COD basis, by cash, Gulf credit card slips, or certified company checks. This proce-

dure did not differ significantly from the working arrangement that Gulf/Chevron had with the Plaintiffs. The difference is that Gulf/BP was no longer willing to accept an uncertified company check, instead requiring a certified check. As before, payment by Plaintiffs was going to have to be received before the product would be delivered. Since Gulf/BP was not assuming the accounts receivable of Gulf/Chevron there were no outstanding invoice to which the Plaintiffs' payments could be applied by Gulf/BP. As the payments by Plaintiffs to Gulf/BP would not be applied to any outstanding invoices owed to Gulf/Chevron such payments now would be true COD payments for product sold to Plaintiffs by Gulf/BP.

Gulf/BP notified the Plaintiffs on January 27, 1985 that effective February 1, 1985 they would have to pay by certified check, cash and/or credit card slips. Mr. Maner responded that he would not purchase any products from Gulf/BP under such an arrangement and that he would go out and purchase his products from other suppliers. Mr. Baucom cautioned Mr. Maner that Gulf/BP would not condone Mr. Maner's purchase of fuel from suppliers other than Gulf and the subsequent reselling of such products as Gulf branded products.

From February 1, 1985 until March 25, 1985 Plaintiffs purchased very little product from Gulf/BP. In fact the majority of the fuel purchased by the Plaintiffs from Gulf/BP during this period was with Gulf credit card slips which slips would only be accepted by Gulf. JFC, which under normal circumstances would have purchased 394,504 gallons of product a month, only purchased 55,400 gallons in a month and a half. Jaxon, which under normal circumstances would have purchased 226,481 gallons a month, only purchased from Gulf/BP 35,200 gallons in one and a half months.

Mr. Baucom, during the time from February 1, 1985 through March 25, 1985, personally observed the tanker truck owned by JFC and Jaxon pulling into the Hess terminal in Paw Creek, North Carolina, loading and leaving that terminal. The Plaintiffs admit that during this period of time they purchased most of their fuel from non-Gulf dealers.

Both JFC and Jaxon truck stops display the Gulf brand identification signs on their dispensing equipment and on large circular signs. They accept Gulf credit cards in payment for any Gulf branded products purchased from the locations. During this period of time, both truck stops continued to utilize their prominently displayed Gulf branded identification signs on their pumps and on their large interstate signs. Mr. Baucom concluded that Mr. Maner was in fact misbranding the Gulf products and he so informed his superior. The Plaintiffs admit they were misbranding and commingling.

On March 27, 1985 Mr. Baucom and Neil Price of Gulf/BP hand delivered to Mr. Maner, President of JFC and Jaxon, notice of termination of Plaintiffs' respective contracts with Gulf/BP, along with summary notices under the PMPA, such termination to be effective April 4, 1985. Copies of such notices were attached to the Complaints filed in these actions. These notices specified that the terminations were on account of Plaintiffs' commingling and misbranding of Defendant's products. After delivery of such notices to the Plaintiffs, counsel for the Plaintiffs requested an extension of time on the termination so that Plaintiffs could locate another permanent supplier. Based on such request, Gulf/BP agreed to extend the effective date of the termination from April 4, 1985 until April 18, 1985. A copy of such extension is also attached to the Complaints in these actions.

On April 17, 1985, the Plaintiffs filed these actions seeking preliminary injunctions enjoining the Defendant from going forth with the terminations on April 18, 1985. The Defendant refrained from actual terminations until this matter could be heard.

Plaintiffs' contentions in support of their motions for a preliminary injunction are identical. They claim that Gulf/BP violat-

ed the PMPA by failing to give them ninety days' notice of termination. Further, although the Plaintiffs admit that they have been misbranding and commingling the Gulf product since February 1, 1985 in clear contravention of their franchise agreements they contend their conduct is excusable because they were coerced into this conduct by the Defendant's COD payment plan. The Court finds neither argument tenable under the circumstances.

## CONCLUSIONS OF LAW

A. *The Standard for a Preliminary Injunction Under The Petroleum Marketing Practices Act*

In deciding whether to issue a preliminary injunction under the PMPA the Court considers whether there was a termination of the franchise, whether there exists sufficiently serious questions on the merits, and the balance of the hardships. 15 U.S.C. § 2805(b). Specifically, Section 2805(b) provides in pertinent part

... the court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed; and

(ii) there exists sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchiser by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

Thus, under the PMPA the franchisee must establish that there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation and that failure to grant injunctive relief will be more burdensome on the plaintiff than the burden on the defendant if the injunction is issued.

■ The issue of what constitutes sufficiently serious questions as to the merits differs significantly from the Plaintiffs' showing in a Fed.R.Civ.P. 65 injunction. *Saad v. Shell Oil Company*, 460 F.Supp. 114 (Mich.1978). The franchisee in *Saad* sought a preliminary injunction pursuant to the PMPA to restrain the termination of its franchise for failure to comply with the cleanliness requirements in the franchise agreement. In considering the legal relationship between likelihood of success on the merits and sufficiently serious questions going to the merits, the Court stated:

Clearly, although Congress wanted and designed an act to protect the franchisee from overbearing franchisers, it did not desire to impose upon the courts needless litigation. The use of the terms "serious question" and "fair ground" indicates that it intended a significant showing of something that would constitute some reasonable chance of success even though it could not be shown that there was a likelihood of probability of success as is required in the ordinary preliminary injunction matter.

The test applied in the ordinary case is "Has the petitioner made a strong showing that he is likely to prevail on the merits ...?" *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). Other phrases used are "strong likelihood of success", or "substantial indication of probable success". In the ordinary preliminary injunction case, the court's attention is directed at a "strong showing" and at "probability".

This statute is intended to require less than that but is clear that it does require something. Instead of a "strong showing" or "probability" of success, the terms "serious question" and "fair ground for litigation" suggest merely a reasonable chance of success, something far less than the probability or likelihood required by *Virginia Petroleum Jobbers, supra,* and *Corning Glass Works v. Lady Cornella, Inc.*, 305 F.Supp. 1229 (E.D.Mich.1969).

The court, therefore, must look at the facts produced to determine whether they indicate "serious questions" that go to the merits and whether such questions make a "fair ground" for litigation or some reasonable chance of success. If the questions are not serious or they do not go to the merits or they do not make fair grounds for litigation or a reasonable chance of success, the injunction should not issue.

460 F.Supp. at 116–17.

Thus, in order to establish that there exist sufficiently serious questions going to the merits, a plaintiff must establish some reasonable chance of success on the merits or the existence of serious questions constituting a fair ground for litigation. If the plaintiff satisfies this initial requirement, he must next demonstrate that the hardship on the plaintiff without an injunction will be greater than the hardship on the defendant with an injunction.

### B. Plaintiffs' Reasonable Chance of Success On Their PMPA Claims

█ The PMPA was enacted to protect petroleum franchisees from arbitrary or discriminatory termination and nonrenewal of their franchises. Congress wanted to equalize the perceived disparity of bargaining power in an economic sense between major oil companies and service station dealers and jobbers. Congress, however, recognized that the franchisers had a legitimate need to terminate or non-renew a franchisee for violations of their agreements which were so serious as to undermine the entire relationship. Hence, the Act specifies permissible grounds for termination of franchisees and the manner in which such termination is effectuated.

Section 2802(c)(10) of the PMPA allows a franchiser such as Gulf/BP to terminate a franchise if the franchisee engages in misbranding, commingling and adulteration of petroleum products.

The second prong of the PMPA test looks at the manner in which the notification of termination was given. Even if a franchiser under PMPA has a permissible reason for terminating the franchise, notice of such termination must be given to the franchisee in a manner proscribed by 15 U.S.C. § 2804. Less than ninety days' notification is permitted under Section 2804(a)(b)(1) under circumstances in which it would not be reasonable to comply with a ninety day requirement.

In the instant cases, both Plaintiffs were given notice of termination on March 27, 1985 by hand delivery of written notices of termination. Both of these notices are attached to the Complaints in these actions. Those notices articulate the reasons for the termination and cite the Plaintiffs to the specific sections of the PMPA under which the termination is being accomplished. Additionally, a summary of the PMPA was attached to the notices and delivered to the Plaintiffs. The notice informed the Plaintiffs that the termination would take effect on April 4, 1985. Upon request of the Plaintiffs, a subsequent letter from Gulf/BP to the Plaintiffs extended such termination date from April 4, 1985 to April 18, 1985. Further, the Defendant did not effectuate the termination until the Plaintiffs' motions were resolved by the Court.

The Plaintiffs' claim that they have received insufficient notice of termination under the PMPA is erroneous, in light of their admitted intentional acts of misbranding and commingling. See, e.g., Wisser Company, Inc. v. Mobil Oil Corporation, 730 F.2d 54 (1984). In Wisser, the franchisee brought an action under the PMPA for an injunction alleging that less than ten days' notice of termination for misbranding was unreasonable. Although the dealer denied misbranding, Mobil hired a private investigator who observed and photographed the non-Mobil gasoline delivery to the station, which at that time was clearly identified as a Mobil station. Consequently, by letter, Mobil notified the dealer that it was terminating the contract immediately because of misbranding. Additionally, Mobil requested the franchisee to arrange to return immediately the equipment loaned to it.

The Second Circuit Court of Appeals in Wisser directly addressed the issue of

whether a ten-day notice of termination was appropriate under the PMPA, when the franchisee was clearly guilty of misbranding:

> Early versions of the PMPA required 90-days notice for all terminations, regardless of the cause, see, e.g., H.R. 16510 and S. 1694, reprinted in Franchised Petroleum Dealers: Hearings on H.R. 16510 ... before the Subcomm. on Communications and Power of the House Comm. on Interstate and Foreign Commerce, 93rd Cong., 2d Sess. 3–9, 24–27 (1974). *The legislative history and hearings, however, indicate that § 2804(b)(1)(A) was added to dispense with the lengthy notice requirement where, for example, a franchisee committed serious defaults of the franchise agreement, such as misbranding.* See S.Rep. No. 120, 94th Cong., 1st Sess. 8 (1975) (predecessor bill, S. 323; misbranding specifically identified as circumstance warranting less than 90-days notice of termination); Petroleum Marketing Practices: Hearings on H.R. 13000 ... and S. 323 before the Subcomm. on Energy and Power of the House Comm. on Interstate and Foreign Commerce, 94th Cong., 2d Sess. 334–36, 340–41 (1976).

> In light of the gravity of Wisser's conduct, we conclude that Wisser has not raised a serious question as to the reasonableness of the forthwith notice of termination. If Wisser was engaged in passing off non-Mobil gasoline under the Mobil trademark, as the district court found Mobil probably would be able to prove, Wisser was committing a serious violation of Mobil's contract and property rights and it was perpetrating a fraud on the public. There was also evidence before the district court that this conduct had been going on for as long as six months before Mobil was able to confirm it. We believe that Mobil was justified in taking steps to stop this practice and to disassociate itself from Wisser immediately. Were Mobil required to wait 90 days or some shorter period between notice and the effective date of termination, there is no reason to believe that Wisser would not have used the time to continue its alleged misbranding to its profit. Moreover, Wisser owned the premises, so it was not faced with immediate eviction and associated financial ruin, and Wisser owns a number of other service stations. True, Mobil recovered its signs and operating equipment from the premises, but Wisser had no right to continue to use Mobil's trademark, and it would not be unduly burdened by having to rent or buy operating equipment of its own. Wisser thus could continue to sell gasoline it was buying from other sources, but not under the Mobil trademark, with perhaps a temporary delay while Wisser obtained and installed substitute equipment. Under the circumstances, forthwith termination was reasonable. See *Esso Standard Oil Co. v. Vargas,* Civ. No. 79–570 (D.P.R. Oct. 24, 1979) [motion to dismiss; less than 10-days notice of termination for misbranding held reasonable under 15 U.S.C. § 2804(b)(1)(A) ].

730 F.2d at 60–61 (Emphasis supplied).

In the present cases, the Plaintiffs have admitted in their Complaints and at the hearing, commingling and misbranding. It is clear from all of the other evidence produced in the Affidavits that the Plaintiffs' misbranding and commingling was pervasive and, but for the actions of Gulf/BP, would have continued at the rate of approximately 18,000 gallons per day. As the Court noted in *Wisser,* if Gulf/BP were required to wait ninety days or some shorter period between notice and the effective date of termination, there is no reason to believe that the Plaintiffs would not have used this time to continue the practice of commingling and misbranding. Additionally, there is no reason why the Plaintiffs cannot, once they divest themselves of the Gulf signs and insignias, continue to sell the petroleum products they were buying from other sources without using the Gulf trademark.

Under the circumstances of these cases, immediate termination was both reasonable and proper. Notice of termination was giv-

en on March 27, 1985 and did not take effect until April 18, 1985 [including the extension]. Thus, Plaintiffs herein were given twenty-two days' notice of termination, twelve more than that approved by the Court in *Wisser.*

The Plaintiffs' claim that they were "forced" to commingle and misbrand fuel because of a change in credit policy is not plausible factually and is legally insufficient. The Plaintiffs have never asserted that they could not obtain a certified check. Rather, their excuse relates solely to the logistics in having to drive to a bank to obtain certification. Further, the Plaintiffs concede Gulf/BP had the right under the contracts to require cash payments for all future deliveries of products. The agreements indicated that the terms of payment were cash on delivery or on credit as approved by the seller. In January of 1985 Plaintiffs collectively owed Gulf/Chevron approximately $525,000. Thus, Defendant merely exercised its contractual right to require cash payments. This change to certified check does not constitute a valid reason for Plaintiffs to breach their contract by commingling and misbranding Defendant's products. *See, Mobil Oil Corporation v. Fadaee,* Case No. 84 CV 3057 (E.D.Mich.1984). *Itin Oil Co. v. Mobil Oil Corp.,* 527 F.Supp. 898 (Mich.1981); *Stewart v. Shell Oil Co.,* 518 F.Supp. 6 (Nev. 1980).

In conclusion, the Plaintiffs are not able to demonstrate that there exists sufficiently serious questions going to the merits to make such questions a fair ground for litigation.

### C. *Balance of Hardships*

Having found that the Plaintiffs cannot meet their burden of demonstrating that there exists sufficiently serious questions on the merits Court need not consider the balance of hardships. *See, Wiser, supra* at 61; *Kesselman v. Gulf Oil Corporation,* 479 F.Supp. 800 (E.D.Pa.1979).

### D. *Conclusion*

As the Plaintiffs have failed to sustain their burden of establishing sufficiently serious questions going to the merits of the litigation the Court concludes that the Plaintiffs' motions for preliminary injunction should be denied.

IT IS, THEREFORE, ORDERED that:

(1) Plaintiff JFC's motion for a preliminary injunction in C–C–85–271–P is *DENIED;*

(2) Plaintiff Jaxon's motion for a preliminary injunction in C–C–85–270–P is *DENIED;*

(3) Defendant may proceed immediately to remove its signs and the decals bearing its trademarks and its credit card imprinters for the truck stops in question.