**AUTOMATIC COMFORT, CORP.**

v.

**D & R SERVICE, INC.**

**No. Civ. H–84–1069 (PCD).**

United States District Court,
D. Connecticut.

Oct. 28, 1985.

---

Eliot B. Gersten, John K. Atticks, III, Gersten & Gersten, Hartford, Conn., for plaintiff.

Richard W. Farrell, Farrell & Barr, Stamford, Conn., for defendant.

## MEMORANDUM OF DECISION

DORSEY, Judge.

In order to obtain the clear right to treat as breached two contracts entered into with defendant, plaintiff seeks a judgment declaring defendant's rights under the contracts null and void. Plaintiff claims it is not limited by the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801, *et seq.*, and asks for a declaratory judgment to that effect. Defendant claims rights

under PMPA to preclude plaintiff's untrammeled invocation of self-help in response to defendant's alleged breaches of contract.

Jurisdiction is found. 28 U.S.C. §§ 1331, 1337, 2201 and 2202.

*Facts*

1. Defendant operates two retail, self-serve gasoline stations under separate, but essentially identical contracts with plaintiff. *See* Exhibits A and B. Neither station provides ancillary maintenance, inspection or repair services to motorists. Each location's operating licenses are obtained by and paid for by plaintiff and issued in plaintiff's name.

2. Plaintiff purchases motor fuel from refiners and suppliers on credit, and resells, either at retail locations operated and owned or leased by it, or to retailers who own their own station locations or lease from third parties or from plaintiff. At the two stations operated by defendant and owned by plaintiff, the latter paid for construction of the structures thereon and all equipment there provided. Plaintiff pays all property and gasoline taxes related to defendant's locations.

3. Plaintiff's fuel sources include refiners which use trademarks and trade or brand names in marketing their product, two of which, Texaco and Mobil, are used by defendant with the permission of the trademark owner.

4. Each contract between plaintiff and defendant was for one year, but could be renewed.

5. The contracts vest defendant with the right to operate and manage in New Britain and Southington, two gasoline stations for retail sale of motor fuel under brand names and trademarks as permitted by the respective refiners.

6. Defendant received commissions specified by plaintiff on the sale of the gasoline, antifreeze and cigarettes, all supplied by plaintiff. The contracts characterize defendant as a commission agent. Defendant earns additional income, as allowed under the contracts, from the sale of lottery tickets and "novelties" as authorized by plaintiff.

7. The parties' mutual interests motivated maximization of sales of all products to the public.

8. The two contracts were drawn by plaintiff. The extent of the negotiations which preceded them is disputed.

9. Defendant is a corporation, the legal alter ego of Donald Longo, defendant's principal employee, officer and shareholder, and guarantor of defendant's contract obligations.

10. Each contract was automatically renewable for one year terms unless a party noticed an intention to terminate or not seek renewal at least ninety days before expiration. The relationship was expected to last beyond one year.

11. Plaintiff did not wish nor intend that defendant come within PMPA in order to avoid the rights created by PMPA in a franchisee. Each contract contains an explicit disclaimer of applicability of the franchise law. The contracts were accompanied by the "summary of rights" required by 15 U.S.C. § 2802.

12. In May 1984 plaintiff determined and duly noticed its intention not to renew the contracts. Such notice complied with the contracts and with PMPA without explicit reference to either.

13. The relationship of the parties was the subject of subsequent negotiation, and they have operated under the contract pending resolution of this case. Plaintiff's position is that the contracts are terminated, it is not obliged under PMPA, and it is entitled to a declaratory judgment. Defendant's view is that the contracts continue in effect and it is entitled to the rights conferred upon a franchisee by PMPA.

14. Plaintiff was obliged to supply products to defendant for retail sale at prices which plaintiff could set at will. Defendant earned commissions at rates also set by plaintiff. Sales of other products and all signs and displays were subject to plaintiff's approval. Plaintiff's obligation to supply products was excused in the event

**1352**

of problems in its obtaining a supply of gasoline. Plaintiff retained title and ownership of the products it supplied until they were sold to retail customers. Plaintiff paid its suppliers for all products delivered to the two stations.

15. Defendant received cash from retail sales and was obliged to deposit the receipts daily, after deduction of its commission, in plaintiff's bank accounts. The commission was 3.2 cents per gallon. Credit card sales were processed as plaintiff directed. Defendant was subject to backcharges for any sales wherein defendant failed to follow plaintiff's "credit card guidelines." Those chargebacks amounted to slightly in excess of $300 for the three year period of the contracts.

16. Defendant was obliged to report and account for all products supplied by plaintiff and thus was responsible and charged for products unpaid for including drive-aways, a risk virtually eliminated by customers' prepayments for gas. Defendant was responsible for any loss or damage of products from causes within defendant's control, leaving to plaintiff the risk of loss in any other manner.

17. Plaintiff reserved all rights in the property and fixtures, including determination of the use of the property not involved in gasoline sales. Rebuilding of the structure would be at plaintiff's determination with a resulting suspension of the operation and defendant's income.

18. Defendant was to maintain the premises and equipment in good condition and was obliged to save plaintiff harmless from all claims arising from the equipment or its use and to pay for restoration and replacement of the equipment except when required as a result of wear or age. Defendant was to insure plaintiff's liability to third persons. Defendant was not required to insure the property, equipment or products on hand.

19. Defendant was to provide expeditious and courteous service to customers by clean, neat employees in compliance with standards and requirements of plaintiff as in the contract and to keep the premises clean, attractive and well lighted. Defendant hired its own employees. Plaintiff supervised the performance of these duties.

20. Defendant was required to provide a security alarm and to remove snow and ice.

21. Defendant was obliged to comply with all laws and regulations pertinent to gasoline sales and to hold plaintiff harmless therefrom.

22. Defendant was deemed "an independent business man for purposes of all laws, federal, state and local." Defendant was obliged to pay all expense of the operation of the pumps and to employ all persons necessary to operate the business. Defendant was to comply with all laws related to the business, including wage, hour, unemployment, insurance, compensation, occupational hazard, health and tax laws.

23. Defendant supplied a security deposit to insure its contract compliance.

24. Defendant rented brand identification signs and credit card machines which imprinted plaintiff's name on the charge slips which were processed by plaintiff for its account.

25. Per the disclaimer, defendant was an independent agent of plaintiff for the purpose of operating "the gasoline islands." The stated purpose was not "to create ... a franchise which would be subject to the provisions of any state or federal law, rule or regulation pertaining to franchises." Each party was responsible for the other's costs and attorney's fees for defense of any assertion of franchise rights.

26. The stations are operated from a booth where an employee of defendant receives money, makes change, controls the flow of gasoline through pumps and sells other items.

27. Defendant pays no rent to plaintiff for or related to the premises.

28. Defendant pays for all utilities.

29. Plaintiff can sell products other than those of Mobil or Texaco, the brands sold at the two locations.

30. Plaintiff wishes to terminate the agreement based on "poor sales performance" allegedly resulting from defendant's inability to operate the two locations.

31. Defendant claims to have built good will at both locations and plaintiff is alleged to be seeking to capitalize on and acquire that good will by excluding defendant.

*Discussion*

*The Connecticut Petroleum Franchise Law Is Not Before Court*

■ Plaintiff has sought a declaratory judgment that its contracts with defendant are not subject to PMPA and that on the basis solely of the contracts' language it may terminate them by giving notice as provided for therein without being subject to either the notice requirements or termination restrictions of PMPA. Defendant, without prior assertion of its claim either in the pleadings or in compliance with the court's Trial Preparation Order, in its post-trial brief, has suggested its right to rely on the Connecticut Petroleum Franchise Law. Conn.Gen.Stat. §§ 42–133j–133n. As this claim is not an issue raised by the complaint or the answer, and was not asserted in the issue framing procedure established by the court's Trial Preparation Order, the Connecticut statute will not be considered in relation to the respective rights of the parties.

PMPA

Defendant invokes PMPA on essentially two grounds: (1) it is either a distributor or retailer as defined by PMPA and its contracts with plaintiff constitute a franchise; and (2) under a broad construction of PMPA it is an independent business entity, not an employee of plaintiff, with substantial indicia of entrepreneurial responsibility and it is substantially at risk in its operation of the two stations. Thus defendant claims that it is within the contemplation of

Congress as an entity intended to be protected by PMPA.

*Franchise Status*

PMPA was enacted to insure availability of competitive sources of fuel for the public's motor vehicles and to protect the retail dealers who are at the bargaining mercy of the giants of the oil industry. *See* Rep. No. 95–731, 95th Cong. 2nd Sess., 30–31, *reprinted in* 1978 U.S.Code Cong. & Ad. News 873, 888–89. To insure stability in retailing of gasoline, PMPA created certain notice requirements and limitations on the reasons for termination or non-renewal of a dealer's contract.

Congress did not limit the distribution process to specific, narrowly defined relationships. Instead, it described the characteristics of relationships it intended to cloak with protection. Yet not all relationships would be subject to the terms and conditions of PMPA.

■ A franchisee is defined as "a retailer or distributor ... authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(4). Defendant is not a distributor. Though it receives gasoline in a narrow sense of the word, as the custodian while the gasoline is stored for retail sale at the station, it does not sell gasoline to its own accounts. A distributor is defined as

any person ... who—
(A) purchases motor fuel for sale, consignment or distribution to another; or
(B) receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person is an employee of, or merely serves as a common carrier providing transportation for, such supplier.

15 U.S.C. § 2801(6). The contemplation of Congress was that a distributor was a middle man, a jobber, *Johnson v. Mobil Oil Corp.*, 553 F.Supp. 195, 198 (S.D.N.Y.1982), not an alter ego to a retailer. A distributor is "not a dealer selling to the public at

retail." *Id. See Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5, 8 (2d Cir.), *cert. denied*, 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 73 (1982). If defendant were correct, there would be no need to define a retailer to fit into the scheme of the act which includes refiners, distributors and retailers. The end of the chain of distribution is a retailer who sells to consumers. Selling fuel to individual customers does not constitute selling to a motor fuel account. The latter connotes a mercantile relationship with volume sales. Defendant cannot cloak itself with PMPA status as a distributor solely on the basis that it "received" motor fuel and at best can claim to be a retailer. *See Farm Stores, Inc. v. Texaco, Inc.*, 763 F.2d 1335 (11th Cir.1985).

■ A retailer is defined as "any person who purchases motor fuel for sale to the general public for ultimate consumption." 15 U.S.C. § 2801(7). Defendant does indeed sell to the general public for its ultimate consumption. However, defendant fails to qualify as a purchaser. It does not act as a traditional purchaser. It does not determine what gasoline it will purchase and then make arrangements for the specific purchases. Plaintiff does all of that. It does not negotiate, contract, arrange credit or pay for the gasoline. Plaintiff does all those things in order to supply gasoline to each location. Title to the gasoline is not acquired by defendant, but is reserved exclusively to plaintiff. Defendant stands no risk for the loss of any gasoline except from causes within its control. It neither pays a fixed price for gasoline nor at any specific time in relation to its delivery. Rather, defendant deposits to plaintiff's account the net sale proceeds, i.e., gross revenue less its commission. Defendant is not affected by any change in the retail price as it may reflect or cause an altered market value. It does not control the retail price and is not at substantial risk in the price fluctuation. Defendant was not required to insure the gasoline inventory and presented no evidence that it deemed itself to be at risk, or that it had an insurable interest, or that it purchased in-

surance on the gasoline. Defendant pays no taxes related to the gasoline. Its credit is not involved. It is not the licensed retailer. *See Farm Stores, Inc.*, 763 F.2d 1335.

Mere custodianship of the gasoline does not vest defendant with title. As between themselves, the parties clearly could and did reserve, pursuant to the contract, all title in plaintiff. Defendant has not shown, nor does it claim, any right to act as the owner of the gasoline and to deal with its property as it chooses, free of any intrusion on its rights by others. While ownership may be divided, there is nothing here to show any actual or intended right of ownership in defendant. Defendant was merely and purely a custodian.

As defendant is neither a distributor nor retailer within the specific language of the act, it would not appear to be protected by PMPA. *Checkrite Petroleum, Inc.*, 678 F.2d 5. That result is not inconsistent with the explicit disclaimer of a franchise status in the two contracts. However, by use of titles, status descriptions or disclaimers, neither one party, by the power of its negotiating strength, nor both parties, by agreement, may avoid a public policy where Congress has engrafted, and thus overridden the terms of a contract, those rights deemed necessary to effectuate the policy. "The interests of the government also frequently override agreements that private parties make." *Simpson v. Union Oil Co.*, 377 U.S. 13, 18, 84 S.Ct. 1051, 1055, 12 L.Ed.2d 98 (1964).

Notwithstanding the seeming clarity in the language of PMPA with which the analysis must start, *Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980), the act has been broadly construed, not infrequently using analogous antitrust differentiations such as that between an employee and an independent businessman. *Simpson v. Union Oil Co.* The contracts in question cloud this issue in referring at once to defendant as "agent," Exhibits A and B at 1, while disclaiming any authority in defendant to bind plaintiff, but, more significantly, agreeing that defendant "is an independent business-

man for purposes of all laws, federal, state and local." Exhibits A and B at 5. While the parties may not subvert a policy mandated by Congress it is not insignificant, particularly in a close case, that the parties' bargain did not include nor intend PMPA protection. Defendant, despite its present protest that its disparate bargaining power resulted in a disclaimer of PMPA coverage, cannot, on this claim alone, come within PMPA. Rather, applicability of the PMPA to plaintiff's arrangement with defendant must be assessed according to the nature and character of the relationship. Thus, against the backdrop of the parties' recitations with respect to their relationship, the question is whether the characteristics of that relationship require defendant to be deemed entitled to the rights and privileges of PMPA.

■ A determination of whether one is or is not within PMPA depends on the existence of significant indicia of entrepreneurial responsibility in the station operator and a showing that that person is at substantial market risk. The absence of either results in the operator's being deemed an employee and not an independent businessman.

Station operators such as defendant are either "employees ... or independent businessmen." *Johnson v. Mobil Oil*, 553 F.Supp. at 197. The fertile minds of negotiators of contracts similar to that in this case defy that "either or" distinction as they craft relationships for particular advantage and risk a court's ability to categorize a party readily as either an employee or an independent businessman. The parties' characterization of defendant's status is, as a result of the incorporation and inclusion of attributes from both categories, unhelpful and not determinative of the issue. It is sounder to determine whether, on balance, the facts in light of defendant's burden of proof demonstrate sufficient entrepreneurial responsibility and exposure to market risks to warrant finding defendant to be within Congress' intended ambit of PMPA protection. *Sanna v. Friendly Service Stations, Inc.*, 593 F.Supp. 493

(D.Conn.1983); *Johnson v. Mobil Oil*, 553 F.Supp. at 199. The suggested focus is on the presence of financial risk imposed on operators in the operation of their stations absent which employee status has been found "despite significant indicia of independent business status." *Id.*

Following *Johnson*, defendant does indeed have significant indicia of independent business status as follows:

1. Defendant hires and fires employees, sets and pays their salaries, their workers and unemployment compensation, social security and withholding, and all lawful obligations arising from their employment. Those employed at the stations are in name and reality defendant's employees.

2. Defendant operates the stations in accordance with standards set by plaintiff and is required to employ persons necessary for the operation.

3. Defendant is obliged for the following expenses:

(a) utilities;

(b) liability insurance, including plaintiff's liability to third persons;

(c) routine daily maintenance of equipment and structures;

(d) equipment restoration or replacement except for that necessitated by normal wear and tear;

(e) snow and ice removal;

(f) pump operation;

(g) lease of brand signs and credit card machines

4. Defendant is obliged to comply with the requirements of law, including zoning, health and occupational hazard requirements.

5. Defendant is obliged to provide a security system.

6. Defendant is obliged for credit card chargebacks if plaintiff's procedure is not followed.

7. Defendant has no fixed salary. Its compensation is unrelated to the price per gallon of gasoline.

8. Defendant was provided with a "summary of rights," required by PMPA, along with the contracts. The notice of termination complies with PMPA. This may have been a legitimate hedge to avoid liability which might have been imposed should PMPA be applied, notwithstanding the disclaimer.

9. Defendant is required to make a detailed accounting to plaintiff for the operation of the gas stations, including specifically the sale of gasoline.

In contradiction of the indicia of entrepreneurial responsibility are the following:

1. The contracts disclaim any franchise rights.

2. Plaintiff retained the right of supervision and inspection of the operation of the stations.

3. The operation of the stations was required to meet plaintiff's standards.

4. The station licenses were in plaintiff's name and paid for by it.

5. Plaintiff had the right to set prices.

6. Plaintiff determined the products which could be sold other than those specified in the contract.

7. Plaintiff determined the use of that part of the property which is not used for gasoline sales.

8. Defendant's use of the property is restricted, particularly with respect to parking.

9. In the event of a casualty loss or contract termination, defendant appears to have no interest in the gasoline on hand.

10. Plaintiff, as owner, was responsible for gasoline taxes.

11. The charge slips were processed under plaintiff's name.

12. No payment for the premises or for any of the equipment furnished by plaintiff was designated as rent. Plaintiff's return on its investment in the land and equipment was to come from its margin on the gas and other products, that is the difference between the costs of the supplies paid to suppliers and the net revenue received from defendant, i.e., the gross sales revenue less defendant's commission, and less, of course, all of plaintiff's operating expenses.

On the balance of these factors alone, there are substantial indicia of entrepreneurial responsibility in defendant's circumstances, yet many of the factors are not inconsistent with the duty that might be imposed upon a management level employee. Even the absence of a fixed salary is not inconsistent with an employee who is paid solely on sales commissions. There are, nonetheless, substantial indicia of defendant's entrepreneurial responsibilities.

Thus, the degree of financial, sometimes characterized as market, risks to defendant must be considered. It is not merely the risk of loss and the risk of incurring expense by the operator that are to be considered. Rather, the courts have looked to see if an operator is at risk from the market forces which affect every retail business, the cross effects of demand, supply, costs and the myriad of factors which affect the fortunes of retail businesses. In defendant's case, there are suggestions it is at risk, as follows:

1. Defendant is liable for expenses, even if they exceed the commissions that it receives.

2. Defendant is responsible for driveaway sales from which slightly over $300 was lost over the term of the contract.

3. Product losses from causes in defendant's control, including employees' acts, are defendant's responsibility.

4. The downside risk of diminished income to defendant due to the absence of a minimum or guarantee of payments, resulting from sales volume, i.e., market risk either from general market conditions or price as set by plaintiff, with a downward effect on volume, could result in expenses exceeding income where there is no floor for the expense level or minimum guaranteed income.

Yet, to the contrary, or minimizing the reality of such risks are the following:

1. Defendant's income is guaranteed to a certain extent, as it is paid a commission on each gallon sold.

2. Defendant is not liable for products purchased and delivered to the stations.

3. Defendant's payment of revenue (sales receipts) is not required until the gasoline is already sold.

4. Defendant's commission is independent of the retail price of the gasoline. Its only risk is if volume is affected negatively. As a practical matter, plaintiff is not likely to set a price that is not competitive. No evidence was offered to suggest that plaintiff either had or was likely to do so. The inference is clearly to the contrary, resulting in little or no risk to defendant from this factor.

5. Defendant is at no risk from a fall of the retail price of gasoline.

6. Defendant has none of the risks of ownership of the gasoline, title remaining in plaintiff.

7. Plaintiff has all of the risks to the gasoline except from causes within defendant's control.

In the final analysis, defendant is theoretically at some risk. Its income from commissions on sales of those products supplied by plaintiff could be less than the expenses for which defendant is obligated. This risk has not been shown to be substantial. Levels of income and expense were not the subject of any evidence. The risks from drive-away (no pay) customers is minimized with customer prepayment and the monitoring of the delivery of gasoline by equipment provided by plaintiff. Such losses and credit card backcharges amounted to $636.20 for three years. Liability for backcharges on credit cards is imposed only upon defendant's failure to follow procedures prescribed by plaintiff, which, if followed, leave the risks to plaintiff. Losses of gasoline fall to defendant only if the causes of the losses are within defendant's control, which plaintiff must prove. Absent such proof, the risk falls to plaintiff. Defendant has not shown what such risks might be nor that any significant risks have fallen to it during the life of the contracts. Employees are often held accountable for losses of an employer's property caused by the employee or factors within the employee's control. Nor has the risk of loss to defendant from market pricing been shown to be great. Plaintiff will not be presumed to be likely to price its product other than to meet the competition since the self-serve type of operation is highly price competitive.

Against defendant's theoretical exposure to financial risks are the risks to which plaintiff, not defendant, is exposed. Defendant has no obligation for the cost of the gasoline purchase nor any of the taxes related to it and its ownership or sale. Defendant has no obligation except to turn over the net proceeds when the gasoline is sold. Its payment is not related to the wholesale price, nor to the time of delivery. Defendant's commission is independent of both the wholesale and retail prices. Defendant is not at risk if, after a purchase, the value of the gasoline drops by reason of a drop in the retail market. Any loss due to reduced market value of the gasoline and the reduced revenue that would result would inure to the detriment of plaintiff, not defendant. If the gasoline were lost, by accident or casualty, plaintiff, not defendant would be at risk. Consistent with the contracts' explicit reservation of title in plaintiff, defendant has none of the risks of ownership of any gasoline and thus does not insure itself against any such risks.

Accordingly, though there are indicia of entrepreneurial responsibility that are not totally insignificant, as well as a minimal degree of risk from market forces, neither has been proven to exist to a sufficient magnitude nor likelihood of occurrence to hold that the circumstances of defendant's operation of the two stations is within Congress' intended umbrella of protection under PMPA.

Judgment shall enter for plaintiff declaring that the two contracts, Exhibits A and B, are not creative of a status or relationship in defendant which would permit de-

**1358**

fendant to claim any of the benefits or protections of PMPA. PLaintiff shall prepare a form of judgment consistent herewith for review by defendant and consideration by the court in anticipation of the entry of a final judgment for plaintiff.

SO ORDERED.