**Jim SIGMON and John Rogers, Plaintiffs,**

v.

**WIDENHOUSE SERVICE, INC., Defendant.**

**No. C–85–288–S.**

United States District Court, M.D. North Carolina, Salisbury Division.

June 20, 1986.

Thomas M. Brooke of Brooke & Brooke, China Grove, N.C., for plaintiffs.

Thomas D. Bunn and Harold W. Berry, Jr. of Hatch, Little, Bunn, Jones, Few & Berry, Raleigh, N.C., for defendant.

**MEMORANDUM OPINION AND ORDER**

HIRAM H. WARD, Chief Judge.

This matter comes before the Court on defendant's Motion for Summary Judg-

ment (February 6, 1986) pursuant to Rule 56, Fed.R.Civ.P. This action is brought by plaintiffs pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–24. Plaintiffs claim that defendant violated the provisions of the act when defendant terminated their business relationship. The Court will grant this motion as it finds that plaintiffs' cause of action is not covered by the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, and therefore jurisdiction is lacking.[1]

## FACTS

The Court will set out the general background information, leaving some facts for later integration and discussion in the analysis. Plaintiffs John Rogers and John Sigmon entered into a Lease and Marketing Agreement with the defendant, dated August 31, 1983, for the operation of a convenience store called JF & K's Mini Mart located in Kannapolis, North Carolina.[2] Plaintiff Sigmon entered into the Agreement as a guarantor having no active part in the operation of the business.[3]

Under the Agreement, plaintiff Rogers operated the convenience store owned by defendant and gasoline was consigned[4] by the defendant to the plaintiffs for sale to the public. Defendant set the price of the gasoline sold, and maintained title to the gasoline until sold to retain customers. Defendant paid plaintiff Rogers a two cent per gallon commission for each gallon of gasoline sold through the pumps on the premises.

In August 1984, plaintiffs were unable to pay defendant monies collected from sales of defendant's gasoline; prior to this certain of plaintiffs' checks to defendant had been returned for insufficient funds. Defendant then terminated its relationship with plaintiffs and padlocked the premises. Plaintiffs assert this caused them to lose their inventory and other items in the store. No written notice was given by the defendant before padlocking the convenience store.

Plaintiffs bring this action pursuant to 15 U.S.C. § 2801 claiming that the termination of the relationship violated the notice requirements of the Petroleum Marketing Practices Act, 15 U.S.C. § 2804, and therefore plaintiff Rogers is entitled to damages. Plaintiffs contend that the relationship between themselves and the defendant is subject to the Petroleum Marketing Practices Act (PMPA). The defendant contends the PMPA is inapplicable and since the PMPA is the only ground upon which federal jurisdiction is predicated, the case should be dismissed for lack of jurisdiction.

## DISCUSSION

In 1978 Congress enacted the PMPA to govern the termination of franchise relationships related to the sale of motor fuel. The PMPA was enacted to protect petroleum franchisees from arbitrary or discriminatory termination and nonrenewal of their franchise, in order to insure stability in retailing gasoline. "Congress wanted to equalize the perceived disparity of bargaining power in an economic sense between major oil companies and service station dealers and jobbers." *JFC Investors LTD. v. Gulf Products Div. of BP Oil*, 608 F.Supp. 1136 (W.D.N.C.1985). Congress, by express language, intended the PMPA to apply only to the franchise relationship

---

1. The parties agree that there is no diversity of citizenship between the parties. The only basis of jurisdiction is federal question jurisdiction arising from the Petroleum Marketing Practices Act.

2. There is no real dispute concerning the facts of this case. Plaintiffs state that they essentially agree with the statement of facts in defendant's brief and do not bring the Court's attention to any disagreement.

3. Sigmon does not seek damages from defendant. The Court will, however, refer to there being plaintiffs in the case, as Sigmon and Rogers are both named plaintiffs.

4. The parties use this term in their pleadings. Whether the parties intended this term to have its legal definition is unclear. The Court will, however, consider the transfer of gasoline from defendant to the plaintiffs as a consignment for purposes of this motion.

between a "refiner," "distributor," or "retailer" of motor fuels under a brand name. 15 U.S.C. § 2801(1)(A) and (1)(B)(2). Unless the parties come within the scope of the statutory definitions of these terms, the relationship between the parties is not covered under the PMPA and general contract principles govern. Not all relationships that concern the petroleum distribution process are subject to the terms and conditions of the PMPA.

The statute defines a "franchise" as: (i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy; (ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed—

(I) under a trademark owned or controlled by a refiner[.]

15 U.S.C. § 2801(1)(B) and (ii).

The definition of a "refiner" is not relevant in this case, but the statutory definitions of a "distributor" and a "retailer" are important to the Court's analysis.

(6) The term "distributor" means any person, including any affiliate of such person, who—(A) purchases motor fuel for sale, consignment, or distribution to another, or; (B) receives motor fuel on consignment for con-

signment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation services for such supplier.

(7) The term "retailer" means any person who purchases motor fuel for sale to the general public for ultimate consumption.

15 U.S.C. § 2801(6) and (7).

In this case the parties both agree that the defendant is a distributor under the PMPA. What is at issue is whether the plaintiff falls within the statutory definition of a "retailer."[5] To come within the provisions of the PMPA and its definition of a "retailer" the plaintiffs must be a "purchaser" of motor fuel.[6] 15 U.S.C. § 2801(7).

In determining whether certain parties come within the PMPA, Courts have followed two approaches. The first is one that looks at the express language of the statute and strays only slightly from it. Courts under this analysis have found no congressional intent expressed beyond the clear language stated in the statute—ergo the words mean what they say. *See Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5, 8 (2d Cir.), *cert. denied*, 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 73 (1982). The other approach is a broader one that attempts to take a totality of the circumstances test—weighing all relevant factors surrounding the nature and charac-

---

**5.** Plaintiffs do not contend they are "distributors" under the statute. Plaintiffs would not fall within the definition of "distributors." Although gasoline may have been consigned to them it was consigned for sale to the consuming public not to plaintiffs' own motor fuel accounts or to accounts of their supplier. Plaintiffs were not independent middlemen acting as a jobber. Plaintiffs also did not purchase the gasoline within the meaning of the statute.

**6.** Plaintiffs were asked in an interrogatory by defendant:

"Did the plaintiffs ever purchase gasoline from defendant for resale at the convenience store."

They answered "No." Despite answering that they did not purchase gasoline, plaintiffs contend this question is of no effect since it did not exactly track the language of the statute. Much like the language in the contract concerning the incorporation of certain of PMPA's provisions, discussed later in this opinion, this answer does not control the issue of the statute's applicability—this answer could have been given for a variety of reasons. Instead, it is the parties conduct and other circumstances surrounding their relationship that is controlling.

ter of relationship to see if the operator is an employee or an independent businessman. If an independent businessman, a party would be within Congress' ambit of PMPA protection as a retailer. Under this approach the statute is read to accomplish a broad remedial purpose that is not to be thwarted by variations in factual settings. *Automatic Comfort, Corp. v. D & R Service,* 620 F.Supp. 1349 (D.Conn.1985). Some cases have applied both tests—not solely relying on either.[7] *See Farm Stores, Inc. v. Texaco, Inc.,* 763 F.2d 1335 (11th Cir.), *cert. dismissed,* — U.S. —, 106 S.Ct. 609, 88 L.Ed.2d 586 (1985); *Johnson v. Mobil Oil,* 553 F.Supp. 195 (S.D.N.Y. 1982).

## I. PLAIN LANGUAGE APPROACH

■ Under the express language of the PMPA, plaintiffs fail to come within its provisions since they are not a retailer because they did not *purchase* motor fuel. The plaintiffs did not purchase the gasoline because title to gasoline and the risk of loss remained with the defendant until the sale to the consumers. There is no transmission of property from the defendant to the plaintiffs'; defendant only transmits gasoline from its truck to its pumps. Plaintiffs merely collected the monies and were paid a commission for so doing.[8]

Plaintiffs did not act as traditional purchaser. They did not determine what gas they would purchase. They did not negotiate, contract, arrange credit or pay for the gasoline. Instead, defendants did all of this. Plaintiffs did not pay a fixed price for the gasoline nor did they set the price to be paid by the consumer. Plaintiffs fail to come within the plain language of the act. *Checkrite Petroleum, Inc. v. Amoco Oil Co.,* 678 F.2d at 8; *see Automatic Comfort, Corp. v. D & R Service,* 620 F.Supp. 1349 (D.Conn.1985); *Johnson v. Mobil Oil Corp.,* 553 F.Supp. 195 (S.D.N.Y. 1982).

## II. OPERATOR'S INDEPENDENCE APPROACH

■ Under a broad reading[9] of the act the determination of whether a party/station operator is or is not covered by the PMPA depends on the existence of significant indicia of entrepreneurial responsibility in the station operator and a showing the station operator is at substantial market risk. The absence of either, results in the operator's being deemed an employee and not an independent businessman. *Automatic Comfort, Corp. v. D & R Service,* 620 F.Supp. at 1355. Station operators are either "employees ... or independent businessmen." *Johnson v. Mobil Oil,* 553 F.Supp. at 197. Employees would not be covered under the PMPA because they lack sufficient entrepreneurial responsibility and exposure to market risk to warrant finding them within Congress' intended sphere of protection. *Sanna v. Friendly Service Stations, Inc.,* 593 F.Supp. 493 (D.Conn.1985).

The Court will first look at plaintiffs' exposure to market risk "absent which employee status has been found 'despite significant indicia of independent business sta-

---

**7.** Stating that there are two clear tests is somewhat of a misnomer. It is not always clear what test or blend of tests is being used by a Court or what test is dispositive. In several cases both tests have been used and have led to the same answer with respect to the PMPA application. However, given the different focus of each test, divergent results would be likely in different factual settings. Because both approaches lead to the same result in this case, the Court is not faced with the decision of deciding if one test is exclusive, or if both are prongs which blend to create a single test with each prong of equal importance.

**8.** While the contract provided that the commission per gallon could be revised upon written notice by the defendant, this commission was not tied to the price per gallon of gasoline nor the profit margin on the gasoline.

**9.** The stricter interpretation takes the statute's plain words at face value and in many respects seems reasonable. "It is a well-established rule that 'when words are free from doubt they must be taken as a final expression of the legislative intent, and are not to be added to or subtracted from by considerations drawn ... from any extraneous source.'" *Checkrite Petroleum, Inc. v. Amoco Oil Co.,* 678 F.2d at 8 (citations omitted).

tus.'" *Automatic Comfort, Corp. v. D & R Service,* 620 F.Supp. at 1355 (citation omitted). The most important indicia of being independent is the presence of market risks. *Farm Stores, Inc. v. Texaco, Inc.,* 763 F.2d at 1344.

In this case the defendant bore the risk as to the sale of the gasoline. The entire investment in the land and facilities was made by the defendant—defendant bore the risk of the entire fuel investment. Defendant paid all property taxes and was responsible for maintaining the exterior of the premises in good repair. Defendant paid all taxes and license fees associated with the sale of gasoline. The risk of economic loss due to depressed prices and reduced sales volume was born by the defendant, since the defendant was paid only for the gasoline sold to motorists at the price it set. The plaintiffs were paid their commission apart from the profit the defendant collected. As in *Farm Stores* here the facts strongly evidence that the defendant not the plaintiffs was the entrepreneur with respect to the sale of the motor fuel and the application of the protective provisions of the PMPA. *Farm Stores, Inc. v. Texaco, Inc.,* 763 F.2d at 1345.

Plaintiffs' argument and the report of their expert mixes the entrepreneurial risk of the gasoline business with that of the entrepreneurial risk associated with the convenience store business. The argument goes as follows: profits from the convenience store were affected by the volume of gasoline sales, therefore the risk of economic loss due to reduced sales volume of gasoline impacts on the risk of economic loss due to reduced sales of items in the convenience store (a risk borne by the plaintiffs). From the foregoing proposition plaintiffs argue that they bear the economic risk of loss accompanied with the sale of gasoline.

The Court rejects this argument. It is independence and risk bearing with respect to gasoline sales that is germane to application of the PMPA. In determining the application of the PMPA, the convenience store's sales should properly be considered separate from gasoline sales. "If independence is the test, it must be independence with respect to the sale of motor fuel.[10] There is absolutely no basis for assuming that Congress intended the PMPA to benefit independent grocers or carwash operators." *Farm Stores, Inc. v. Texaco,* 763 F.2d at 1345. While it is true that the plaintiffs paid half the utilities and the premiums for liability insurance and were liable for any negligence in the operation of the station/convenience store, courts have uniformly rejected attempts to attach significance to these factors. *Farm Stores, Inc. v. Texaco, Inc.,* 763 F.2d at 1344–45. These factors do point to some entrepreneurial risk but are outweighed by other factors.

The second prong, to determine the level of the operator's independence, is the existence of significant entrepreneurial responsibility in the station operation. Plaintiff was required to keep the premises clean, safe and in a healthful manner. The plaintiff was responsible for all labor matters concerning employees who worked at the station including hiring and firing—they were plaintiffs' employees. Plaintiffs were obliged to comply with all laws and ordinances related to the premises. Plaintiffs were liable for all bad checks, driveways or losses due to credit card fraud if caused by plaintiffs negligence or failure to follow proper procedures.

However, the defendant paid half of the utilities, all property taxes and licensing fees. Defendant set the price of the gasoline and paid a flat commission to plaintiffs. Defendant was responsible for gasoline taxes and any loss to the gasoline. The gasoline licenses were in defendant's name. Defendant required plaintiffs to operate the station according to certain of its

---

**10.** Motor fuel under that statute is defined as gasoline and diesel fuel of a type distributed for use as a fuel in self-propelled vehicles designed primarily for use on public streets, roads and highways. 15 U.S.C. § 2801(12). Gasoline would fall under this definition, kerosene would not.

standards. No rent was paid by plaintiffs for the premises.[11]

In this case there are facts supporting and contradicting plaintiffs' entrepreneurial responsibility. Some facts that are indicia of substantial entrepreneurial responsibility are also "not inconsistent with the duty that might be imposed upon a management level employee." *Automatic Comfort Corp. v. D & R Service*, 620 F.Supp. 1349 (D.Conn.1985). While the question of entrepreneurial responsibility is arguable, however, absence of the operator's risk of loss clearly weigh against plaintiffs being characterized as independent.

## CONCLUSION

The Court in this opinion has framed the issue in this case as being a purely jurisdictional one rather than an ultimate decision on the merits. This is because the parties agreed in the contract that defendant had the right to declare the agreement terminated *consistent* with the requirements of the PMPA. The parties in essence incorporated a substantial portion of the PMPA into their contract. Therefore, the dismissal in this case because of the inapplicability of the PMPA will in all likelihood not change the ultimate result but only the forum in which it is rendered—the PMPA's inapplicability only destroys the basis for subject matter jurisdiction.

▮ Plaintiffs argue that this reference in the contract to the PMPA is an important revelation as to its relationship with the defendant, and perhaps even dispositive of that relationship. The Court finds this language inconclusive at best, it is the relationship established by the entire contract and the subsequent performance of it that is relevant to the PMPA's application. This provision's inclusion in the contract could have been included due to inadvertence, hard bargaining by the plaintiffs or a variety of other reasons beside evidencing an intent to be governed by the PMPA.

The Court did consider this contract reference in determining the PMPA applicability, but however free the parties are to incorporate by reference statutory provisions as terms of their contract, they do not possess the same freedom to create statutory coverage and thus federal jurisdiction.

The Court has attempted to refrain from any judicial amendment of the PMPA. While the statute covers a number of relationships it has its limits which are expressed by the language used in the statute. *See Nelson v. Piedmont Aviation, Inc.*, 750 F.2d 1234, 1237 (4th Cir.1984). If Congress intended the type of relationship in this case to be covered by the PMPA, its inclusion must lie within Congress. *Cf. Sedima S.P.R.L. v. Imrex, Co., Inc.*, — U.S. —, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (Supreme Court unwilling to correct RICO statute as correction must lie with Congress).

IT IS, THEREFORE, ORDERED that defendant's Motion for Summary Judgment be, and the same hereby is, GRANTED.

---

**11.** Plaintiffs paid the first two monthly rent payments. This money was refunded after the parties agreed that no further rent payments would be necessary as plaintiffs agreed to pay one half of the utilities.