**John F. SANNA, et al.**

v.

**FRIENDLY SERVICE STATIONS, INC., et al.**

**No. B83–653.**

United States District Court,
D. Connecticut.

Nov. 28, 1983.

Miles F. McDonald, Jr., Badger & Fisher, Stamford, Conn., for plaintiff.

Elliot Gersten, Hartford, Conn., for defendant.

## RULING ON APPLICATION FOR PRELIMINARY INJUNCTION

ELLEN B. BURNS, District Judge.

This case is before the court pursuant to a proper removal under 28 U.S.C. § 1446(b) by defendants Friendly Service Stations, Inc. ["Friendly"], Consumers Petroleum of Connecticut, Inc. ["Consumers"], and Ernest A. Wiehl, Jr. Plaintiffs John and Lawrence Sanna commenced this action in the Connecticut Superior Court on August 25, 1983, alleging breach of contract, fraud and unfair trade practices in connection with their operation of two Friendly gas stations in Norwalk, Connecticut. After they amended their complaint on September 27, 1983, to include a claim that defendants' actions also violated the federal Petroleum Marketing Practices Act (PMPA or Act), 15 U.S.C. §§ 2801 *et seq.*, defendants sought federal jurisdiction of the action.

Following the commencement of the state action against them, defendants notified plaintiffs that their employment was terminated and that they were to quit the premises of the two stations. Defendants also went to one of the stations and attempted physically to repossess the premises. Plaintiffs then sought to enjoin defendants from taking any further action to remove them on the grounds that defendants did not comply with the termination provisions of the PMPA, that argument being made first in state court in connection with an application for a temporary restraining order and now in federal court in this application for a preliminary injunction.

By agreement of the parties, an evidentiary hearing was held on October 24, 1983, limited to the threshold issue of whether the relationship of the plaintiffs and defendants constituted a "franchise" under the PMPA. The parties agreed that the court's findings on this issue would be conclusive on the applicability of the PMPA

and dispositive of the viability of the federal claim. Only if plaintiffs were found to be franchisees could they proceed on the action for injunctive relief under the PMPA, 15 U.S.C. § 2805(b)(2).[1] The parties were apprised that this court did not intend to exercise pendent jurisdiction over the state causes of action if the court found that plaintiffs were not franchisees and thus that the PMPA offered them no procedural or substantive protection. The following constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FACTS

### 1. *Procedural History*

Plaintiffs have operated the two Friendly stations since December, 1980, and February, 1981. "Friendly # 21" carried Mobil gas and products and "Friendly # 29" was a Texaco station. On August 25, 1983, plaintiffs brought suit in state court, claiming they were not receiving the monthly bonuses to which they were entitled according to their "employment agreement." Before the return date, September 27, 1983, plaintiffs received a Notice to Quit each of the premises by September 30, 1983, pursuant to the Connecticut Summary Process statute, Conn.Gen.Stat. § 47a–23 *et seq.* However, on September 18, a Sunday, at 5:00 a.m., defendants broke the alarm and door at "Friendly # 29", 131 New Canaan Avenue, in an attempt at self help repossession. On September 21, 1983, plaintiffs obtained an ex parte temporary restraining order, which by its terms prohibited the defendants from curtailing the normal supply of petroleum to, or interfering with the operation of, the stations. The next day, there was a limited evidentiary hearing in

front of the issuing judge, Judge Novack, in response to defendants' motion to dissolve the order, which resulted in some modification of the order. A hearing was scheduled for October 3, 1983, to address the matter more fully, but due to time constraints in the state court and the subsequent removal of the case to federal court, that hearing never was held. On October 11, 1983, this court heard defendants' renewed motion to dissolve the temporary restraining order. The order was neither dissolved nor modified by this court, however, because of the disagreement of the parties as to the terms of the state court order and the unavailability of a transcript of the September 22nd hearing. Nevertheless, it is clear that at the hearing, an escrow account was established, to be held jointly by counsel for plaintiffs and defendants. Plaintiffs have remitted all proceeds of sales into that account. Defendants have interpreted the state court order to mean that they no longer must supply gasoline to the stations and have not done so. Defendants have also prevented Mobil from supplying gasoline directly to plaintiffs. Thus, at present, no gasoline is being sold at the stations.

### 2. *Relationship of the Parties*

Defendant Ernest Wiehl, Jr., president of Consumers, owns real estate known as 309 Main Street and 131 New Canaan Avenue in Norwalk, the sites of the stations. Consumers leases these locations from Wiehl and subleases them to Friendly. Consumers is a Connecticut corporation engaged primarily in the business of purchasing motor fuel for sale, consignment or distribution to others. Friendly is a Connecticut

---

**1.** 15 U.S.C. 2805(b)(2) states in relevant part:
[T]he court shall grant a preliminary injunction if—
  (A) the franchisee shows—
    (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
    (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

  (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.
It is implicit that the establishment of the existence of relationship between the parties is a precondition to the applicability of this provision.

corporation in the business of purchasing motor fuel for sale to the general public. The exact corporate relationship of Friendly and Consumers was not made clear at the hearing or in the affidavits, but precision on that issue is not necessary for the resolution of this matter.[2] It appears that both Consumers and Mobil, if not Texaco, supplied petroleum products to Friendly. There was credible testimony by Mr. McNally, a marketing representative with Mobil, that when Mobil supplied gas to "Friendly # 21", it issued a draft on the Friendly account, not on any account with the Sannas.

The relationship of the plaintiffs with the defendants began in December, 1980. There were two negotiating meetings, attended by John and Lawrence Sanna, John Aleman, vice president of Friendly, and Albert Crane, Consumers' sales manager. At the first meeting, Mr. Crane discussed the risks of the proposed agreement, particularly with regard to a repair business to be operated on the premises of 309 Main Street. At the second meeting, a number of proposed agreements were circulated. One such agreement, plaintiffs' Exhibit 1, was determined to be the articulation of the controlling terms. John and Lawrence Sanna signed that agreement, and Lawrence Sanna also signed a personal guarantee, warranting compliance with the terms of the agreement. The Sannas were given an unsigned copy of the document. Both Mr. Aleman and Mr. Crane denied signing the agreement, testifying that it would have had to have been approved by their superior, although there is no dispute that the terms of the document were intended to—and did—govern the relationship. John Sanna testified that Aleman and Crane did sign that particular document; Lawrence Sanna said he saw them sign something that day. The Sannas expected to receive a signed copy later but never did.[3] Neither Consumers nor Friendly could produce the signed document; indeed, Mr. Crane said he does not know the location of the entire file relating to the Sannas. Because the PMPA does *not* require a written contract for a franchise, 15 U.S.C. § 2801(10), this court need not decide every detail of what transpired that day. It is sufficient to state the court finds there was a genuine meeting of the minds on the terms agreed upon by the Sannas and the duly authorized agents of defendants Consumers and Friendly. The Sannas believed themselves bound and have since acted in accordance with the terms of the agreement. For over two years Friendly and Consumers have also complied with the agreement. This court therefore finds plaintiffs' Exhibit # 1 to be a true reflection of the parties' contractual intent as to their respective relationships and that a contract existed.

At the same meetings, the rental of four bays at the 309 Main Street location for automobile repair work was discussed. An oral lease of the bays was agreed upon. Plaintiffs do not lease the premises involving the gas pumping aspect of the business. Mr. Aleman told the Sannas that, if they proved successful in the gasoline business, Friendly would apply for a state repair license, and did do so. There was a problem with insurance, since the insurance for the repair business apparently had to be taken out in Friendly's name. For whatever reason, the promise to the Sannas to supply them with a repair license was not fulfilled despite the fact that the Sannas admittedly met the precondition of successful operation of the stations. The Sannas have therefore been leasing the bays and doing business as "S & S Automotive" without a license, which has limited the types of repairs they can perform.

**2.** The Appellate Session of the Superior Court of Connecticut recently characterized Friendly as the "subsidiary" of Consumers. *Consumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn. Sup. 495, 496, 452 A.2d 123 (1982).

**3.** Plaintiffs are automobile repairmen, not contract lawyers and the court does not fault them for not following up on the receipt of a signed copy of the agreement. It was incumbent upon Mr. Aleman and Mr. Crane to make sure the controlling agreement was signed and sent to plaintiffs.

The terms of the agreement are that plaintiffs would function as managers of the two stations. They pay no rent for the gas pumping premises. Each plaintiff received a fixed weekly salary of $275.00, with the potential for a monthly bonus. A monthly operating budget was established based on $.035 per gallon up to 100,000 gallons sold monthly, and $.0275 per gallon in excess of 100,000 gallons sold monthly. Thus, the budget was dependent on the volume, not the price, of the gasoline sold. Certain expenses were deducted from that budget. Whenever expenses were less than the budgeted amount, plaintiffs received the excess as a bonus. If plaintiffs operated over budget, defendants allege that nothing would be deducted from their salary. Plaintiffs maintain that the only reason nothing was ever deducted was that they never operated over budget. The written document evidencing the parties' agreement is silent on this eventuality. This court can only determine conclusively that no deductions were made from plaintiffs' salaries due to costs exceeding the budget. In any event, these bonuses apparently do not involve much money on a monthly basis. Plaintiffs' Exhibits 5 and 6, Bonus Worksheets for the stations for the month of October, 1981, show bonuses of $218.49 and $251.37. It is plaintiffs' contention that defendants ceased paying any bonus or giving them an accounting as to how the budget was being spent on operations that serves as the basis for the original lawsuit.

According to testimony and the written agreement, the items that were deducted from the budget were payroll, including plaintiffs' own salaries, electricity, heat, water, uniforms, telephone (consisting of collect calls made with business reports), and cash shortages, due to "runaways" or bad credit cards. Plaintiffs have some control over their bonuses in that they are able to determine how many employees they will hire and the salaries of those employees. Paychecks are issued by Friendly, however. Plaintiffs do not pay for the gasoline, although they place the order and determine how much product is needed.

Defendants set the retail price per gallon. Plaintiffs deposit daily the cash proceeds from sales in a Friendly account and remit any credit card receipts (Mobil or Texaco). The proceeds are then used to pay for succeeding gas deliveries.

In addition to the regular expenses, plaintiffs have incurred unreimbursed expenses in the repair and maintenance of the stations, possibly in derogation of the original agreement. Plaintiffs repaired the roof, furnace, windows, one automobile lift, and the wall at the Main Street location. Plaintiffs have repeatedly changed the locks on the building at their own expense. They bought one lift, and own all the desks and repair tools.

Although plaintiffs may not have borne any risk regarding over budget operations, they were responsible for paying for customers leaving without paying, improper credit charges and any cash shortages. Plaintiffs have maintained detailed records of fuel delivered, gallons pumped and sales volume, with daily inventory sheets submitted to defendants. They have in fact made up any cash shortages and, up until the time of this lawsuit, were considered honest, trustworthy and diligent station operators by defendants. Defendants determined the hours that the stations were to be open, and plaintiffs have abided by those requirements of 6:30 a.m. to 10:00 p.m., being personally present the majority of the time. The operation of the S & S automotive repair business at the Main Street location in no way compromised the gas pumping operation as plaintiffs made sure that they, or their employees, were immediately available to service customers. They incurred a direct financial liability in having employees available, as the salaries of those employees were deducted from the available bonus monies.

## DISCUSSION

As the above facts show, the Sannas' status with respect to Friendly and Consumers is "of a hybrid nature, not easily classified as either that of ... employ-

ee[s] or ... independent business[men]." *Johnson v. Mobil Oil Corp.*, 553 F.Supp. 195, 197 (S.D.N.Y.1982). The court will look beyond the label the parties attached to the relationship and examine whether defendants clothed plaintiffs with sufficient independence to bring them within the protection of the PMPA. *Johnson, supra* at 197; *Roberts v. Exxon Corp.*, 427 F.Supp. 389, 390 (W.D.La.1977). The fact that the controlling agreement is headed "Employment Agreement—Station Manager" rather than "Franchise Agreement" is therefore not the end of the inquiry.

The "starting point" of interpreting the applicability of the PMPA is the language of the statute itself. *Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5, 7 (2d Cir.), *cert denied* 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 73 (1982). It is clear from that language, and admitted by plaintiffs, that persons who are employees are not entitled to the protections of the PMPA, 15 U.S.C. § 2801(6). After applying the facts, determined from the hearing, to the statutory scheme, the court finds that plaintiffs do not meet the definition of a franchisee under the plain language of the PMPA. Even under an analysis broader than a literal reading of the Act, plaintiffs do not have sufficient indicia of independence and business risk to distinguish them from ordinary managerial employees, and place them within the intended protection of the PMPA.

Although not bound by a decision of another district, the court finds the *Johnson* case to be a well reasoned, thorough and persuasive decision. The facts and circumstances of the present plaintiffs' employment relationship are not identical in every respect to those of the plaintiff in *Johnson*, but, contrary to the Sannas' assertions, the differences that exist do not remove this case from within the reasoning and holding of *Johnson*.

The term "franchisee" is defined in the Act as "a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(4). Plaintiffs do not argue that they are distributors, under 15 U.S.C. § 2801(6), as it is well accepted that "Congress had in mind an independent middleman acting as a jobber, not a dealer selling to the public at retail." *Johnson, supra* at 198; S.Rep. No. 95–731, 95th Cong., 2nd Sess. 30–31, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 888–89. However, plaintiffs claim they are retailers, defined in the Act as "any person who purchases motor fuel for sale to the general public for ultimate consumption," 15 U.S.C. § 2801(7). The key is whether plaintiffs actually purchase the gasoline from Friendly. As did the plaintiff in *Johnson*, plaintiffs here have argued that they do purchase fuel on what amounts to a "load-to-load" credit arrangement, wherein a dealer pays the supplier for each load when the next load is delivered. On this issue, the Sannas' arrangement is identical to that of Johnson. The plaintiffs remit the proceeds of their daily sales to Friendly. The amount remitted is based strictly on the volume previously sold, not the volume delivered, and is based on the retail sales price set by Friendly, not the wholesale price of the gas delivered. There was no testimony that plaintiffs posted any security for credit extended for the gasoline. If anything, the testimony showed that *Friendly* was a retailer, purchasing on a load-to-load basis from its supplier, Consumers. The money deposited daily by the Sannas in Friendly's account was the source of funds used by Friendly to pay for future deliveries to the two Friendly stations.

Plaintiffs urge the court to look beyond any "hypertechnical" definition of the term "purchase," arguing gasoline was transmitted to them according to an agreement founded upon valuable consideration. The court was impressed with the long hours worked by the Sannas, money paid by them to improve the premises, and their obvious dedication. As John Sanna testified, there is no doubt that where his salary and bonuses are divided by the number of hours he works, he earns far below the hourly

minimum wage. Certainly Friendly got a very good return on its "investment" in the Sannas. However, this court cannot re-write the terms of the parties' bargained-for agreement. It strains reason to say that the Sannas' work and time is anything more than consideration for their guaran-teed weekly salary and right to earn a bonus. In no sense of the word do they "purchase" the gasoline, in that they do not have unfettered control over it once it is in their possession, and they must remit all proceeds from its sale to defendants. The fact that John Sanna determines how much will be delivered and when is not significant, as it is consistent with the dis-cretion commonly granted to a manager. This court is persuaded by Judge Sand's reasoning in *Johnson* that arrangements as in these cases are not "purchases."

Even looking beyond the term "pur-chase," the Sannas other substantial re-sponsibilities still fail to constitute suffi-cient independence and risk. Plaintiffs ar-gue that, unlike *Johnson*, they do lease the gas pumping facilities as do most indepen-dent dealers. The court does not so find. The evidence shows there was an effective oral lease between the parties, but *only* for the repair bays at the 309 Main Street station. The insurance document, plain-tiffs' Exhibit # 10, does not prove other-wise. It only relates to 309 Main Street; there was no evidence of an insurance poli-cy for the 131 New Canaan Avenue proper-ty. Although the document states that in-surance is afforded to the gas pumping operation as well as the repair bays, the named insureds are the Sannas (S & S Automotive) *and* Friendly. This is consist-ent with the finding that Friendly did not lease the gas pumping area to plaintiffs, remaining the insureds for that aspect of the station.

There does exist a slight variation in the compensation schemes between this case and *Johnson*. Plaintiff Johnson received a set salary plus a commission based solely on volume, from which no deductions ap-peared to be taken. In addition, Johnson was given an estimated labor budget from which he was to pay employees. All per-sonnel expenditures in excess of this budg-et were solely the responsibility of plaintiff Johnson. The Sannas argue that because, unlike *Johnson*, their additional compensa-tion was dependent on the costs of opera-tion,[4] their income is more fluctuating, and they are thus somehow more independent than Johnson. They also allege that if their monthly costs exceeded the monthly budget, the balance would be deducted from previous bonuses. There is no evi-dentiary support for that proposition, how-ever, and the court declines to find such a fact. Thus, if Johnson were to exceed his budget on at least the labor portion of operating expenses, he would have to pay the excess, whereas the Sannas did not appear to have to reimburse defendants for any overages. It is true that the Sannas were responsible for other operating ex-penses for which Johnson was not, and also were more vulnerable to the "risks" of runaways and cash shortages. However, these types of expenses are relatively mi-nor when compared to the guaranteed na-ture of their salaries. The essence of the *Johnson* holding was that Johnson did "not bear the quantum of market place risk ... necessary to characterize him as an inde-pendent dealer and franchisee." *Johnson, supra* at 199. The fluctuations in the San-nas income caused by runaways or in-creased heating costs simply do not change the fact that the Sannas, like Johnson, are truly "considerably insulated from fluctua-tions in market demand due to changes in price." As in *Johnson*, the only effect gas price fluctuations have on their commission is to the extent those fluctuations impact sales volume.

For all the above reasons, the court finds that plaintiffs' situation differs only in in-

---

**4.** Plaintiffs have highlighted as significant the fact that the written agreement characterizes the items to be deducted as those for which a "fran-chised dealer" would be responsible. The usage here is obviously a shorthand and descriptive. There is more to being a franchisee than being responsible for those expenses. The itemized expenses do not make plaintiffs any more vul-nerable to market fluctuations. *See* discussion, *infra*.

significant respects from that of the plaintiff in *Johnson*. Therefore, this court finds that, despite the fact that plaintiffs exercise significant control over the daily operation of the two stations, they do not bear "the level of marketplace risk that Congress had in mind in defining the scope of franchise protection under the PMPA." *Johnson, supra* at 200. Plaintiffs are not franchisees and are not entitled to the termination protection provisions of the PMPA.

## CONCLUSION

As plaintiffs have failed to establish their status as franchisees, their application for a preliminary injunction under the PMPA is denied. The court in its discretion declines to exercise pendent jurisdiction over the state causes of action, *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Defendants urge this court to dismiss rather than remand, relying on the reasoning in *Gibbs* that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well," *Id.* However, *Gibbs* involved federal and state claims that were commenced by plaintiff in federal court, not a situation such as this case where plaintiffs proceeded in state court but defendants, albeit properly, removed the matter to federal court. Pursuant to 28 U.S.C. § 1441(c), this court has discretion to remand all matters that have been removed here which are not otherwise within this court's original jurisdiction. "Since this case was originally filed in state court, it would be unreasonable to dismiss without prejudice and require [plaintiffs] to file anew in state court," *Till v. Unifirst Federal Savings & Loan Association*, 653 F.2d 152, 162 (5th Cir.1981).

Accordingly, plaintiffs' application for a preliminary injunction is denied and this action is remanded to Connecticut Superior Court.

SO ORDERED.