**Elie N. KARAK and Russell and Elie Incorporated d/b/a Newton Mobil, Plaintiffs,**

v.

**BURSAW OIL CORPORATION, Alliance Energy Corp. and National Development of New England, Defendants.**

No. Civ.A. 01–10727–RCL.

United States District Court, D. Massachusetts.

May 30, 2001.

Richard P. Blaustein, Boston, MA, for Elie N. Karak, Russell & Elie Incorporated dba Newton Mobil, plaintiffs.

Raymond S. Ewer, Tennant & Ewer, Newton, MA, for Bursaw Oil Corporation, Alliance Energy Corporation, National Development of New England, defendants.

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO DISMISS

LINDSAY, District Judge.

Before the court are the plaintiffs' Emergency Motion for Mandatory or Prohibitive Injunctive Relief and Interim Equitable Relief (Docket No. 2) and the defendants' Motion to Dismiss (Docket No. 6). On May 10, 2001, a hearing was held on the motions. For the reasons stated below, the plaintiffs' motion is denied and the defendants' motion is allowed.

### Background

I will summarize the general background facts of the case, reserving other details for discussion with the issue raised. The plaintiffs, Elie Karak and Russell and Elie Inc., sell motor fuel at a retail service station in Newton, Massachusetts. The property is owned by Randolph Corporation, which is a wholly owned subsidiary of the defendant, Bursaw Oil Corp. ("Bursaw" or the "defendant"). Bursaw is a wholesaler and distributor of motor fuel products. Commencing in 1989, the parties began a series of agreements both to lease the property to the plaintiffs and to supply the station with motor fuel products. The most recent agreement between the parties with respect to the sale of motor fuel products, the Gasoline Consignment Agreement (the "Agreement"), effective beginning July 1, 1997, sets forth the current relationship of the parties. Details of the Agreement are set forth in the discussion section below.[1]

On or about February 20, 2001, the plaintiffs met with representatives from Bursaw. The plaintiffs were informed that their lease would not be renewed because

---

1. All factual matters on which I will rely are    undisputed.

the Newton station had been sold to a third party. On March 28, 2001, the plaintiffs received a thirty day notice to quit the premises. On April 27, 2001, the plaintiffs filed an Emergency Motion for Mandatory or Prohibitive Injunctive Relief and Interim Equitable Relief to prevent Bursaw from forcing them to quit the premises. The motion was based upon an alleged violation of the Petroleum Marketing Practices Act ("PMPA" or the "Act"), 15 U.S.C. §§ 2801–2841, which sets forth the permissible grounds for termination or nonrenewal of franchise relationships respecting the sale of motor fuels. The parties reached an interim agreement, holding in place the proceedings concerning termination of the lease pending a ruling from this court on the emergency motion. On May 7, 2001, the defendants filed a motion to dismiss asserting that the court lacked subject matter jurisdiction of the plaintiffs' claims. On May 10, 2001, the court held a hearing on the motions. Following the hearing, both parties submitted additional arguments and supporting materials.

*Discussion*

The basis for the plaintiffs' motion for preliminary injunction is that the defendants violated the PMPA when they terminated or failed to renew the plaintiffs' lease. In opposition to the plaintiffs' motion, the defendants argue that PMPA does not apply to the relationship between the parties in this case; that the emergency motion therefore should be denied; and that count I of the amended complaint, which alleges a violation of the PMPA, should be dismissed for lack of subject matter jurisdiction.

I do not view the controversy as one in fact about jurisdiction. Based on the well-pleaded facts in the plaintiffs' amended complaint and drawing all reasonable inferences in favor of the plaintiffs, I cannot determine that the plaintiffs have failed to allege subject matter jurisdiction. *See Pejepscot Indus. Park, Inc. v. Maine Cent. R. Co.*, 215 F.3d 195, 197 (1st Cir. 2000) ("For the purpose of determining whether the district court has subject matter jurisdiction, we take the well-pleaded allegations in plaintiff's complaint as true"). Rather, the defendants' motion and the gravamen of the dispute between the parties is best characterized as one testing whether the plaintiffs can establish an essential element of their claim under the PMPA, namely whether a "franchise relationship" exists between the parties as the Act requires. Indeed, the parties have argued the matter as one for summary judgment. They have relied on matters outside of the pleadings, which they say are necessary to decide defendant's motion to dismiss and, by notice of the court, they have submitted additional argument and materials on the contested issue. *See Maldonado v. Dominguez*, 137 F.3d 1, 5 (1st Cir.1998) (the court may enter summary judgment *sua sponte* only if it first gives the targeted party appropriate notice and a chance to present its evidence on the essential elements of the claim). Had the defendants' motion to dismiss for lack of subject matter jurisdiction been appropriate, treatment of the motion as one for summary judgment would not have been necessary. *See Dynamic Image Technologies, Inc. v. United States*, 221 F.3d 34, 37 (1st Cir.2000) (On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), "[t]he court, without conversion, may consider extrinsic materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness of the plaintiff's allegations"). Therefore, I will treat the defendants' motion as one for summary judgment, raising the question of whether the plaintiff has a trialworthy claim under the PMPA. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 258 (1st Cir.1999) ("If

the appellant did not frame a trialworthy issue as to [an] essential element of his claim, Fed.R.Civ.P. 56(c) authorized the entry of summary judgment").

The PMPA was enacted by Congress to govern exclusively the area of termination and non-renewal of retail service station franchise relationships. *See* 15 U.S.C. § 2806(a). Section 2806(a) preempts any state law, statutory or common, in the area of termination or nonrenewal that is different than the PMPA. Section 2806(a) states:

> To the extent that any provision of this subchapter applies to the termination ... of any franchise, ... no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination ... of any such franchise ... unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

Congress specifically set forth the permissible grounds for termination or nonrenewal of franchise relationships, and bestowed on federal courts jurisdiction to remedy violations of the PMPA. Generally, termination of a franchise relationship must have as its basis one of the grounds set forth in §§ 2802(b)(2) and 2802(b)(3),[2] and must be undertaken in compliance with the procedural notice requirements of § 2804.[3] At the hearing on this matter on

---

2. Sections 2802(b)(2) and (b)(3) set forth nine grounds for termination or nonrenewal of a franchise relationship. For purposes of this action, Section 2802(b)(3)(D) states, in pertinent part:

> "(b) Precondition and grounds for termination or nonrenewal
> (3)(D) In the case of any franchise entered into prior to June 19, 1978, (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if—
> (i) such determination is—
> (I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,
> (II) to materially alter, add to, or replace such premises,
> (III) to sell such premises, or
> (IV) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;
> (ii) with respect to a determination referred to in subclause (II) or (IV), such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and
> (iii) in the case of leased marketing premises such franchisor, during the 90–day period after notification was given pursuant to section 2804 of this title, either—
> (I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or
> (II) if applicable, offered the franchisee a right of first refusal of at least 45–days duration of an offer, made by another, to purchase such franchisor's interest in such premises."

3. Section 2804 states, in pertinent part:

> "(a) General requirements applicable to franchisor
> Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship—
> (1) in the manner described in subsection (c) of this section; and
> (2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.
> ***
> (c) Manner and form of notification

May 10, 2001, the defendants acknowledged that they have failed to comply with the requirements of the PMPA, but contend that they were not required to do so because the PMPA does not apply to this case. Specifically, the defendants contend that the parties' relationship does not meet the definition of a "franchise relationship," set forth in the PMPA.

The PMPA provides that a "franchise relationship" only can exist between a "refiner and a distributor," a "refiner and retailer," a "distributor and another distributor," or a "distributor and a retailer" of motor fuels. See 15 U.S.C. §§ 2801(1)(A)(i)–(iv). The defendants acknowledge that they fall within the definition of a "distributor." Therefore, the gist of the dispute between the parties is whether the plaintiffs fall within the statutory definition of "retailer."[4] Absent a showing by the plaintiffs that they are within the class Congress intended to protect, there is no coverage under the PMPA, general contract principles govern, and the plaintiffs' motion must be denied.

The starting point for this analysis, of course, is the Act itself, which states in pertinent part: "The term 'retailer' means any person who *purchases motor fuel for sale to the general public* for ultimate consumption." 15 U.S.C. § 2801(7) (emphasis added). To determine whether the plaintiffs "purchase[ ] motor fuel," the court must look to the relationship between the parties as set forth in the Agreement.

Pursuant to the Agreement, the defendants undertake to use "reasonable efforts to keep in the underground storage tanks ... a quantity of motor fuels sufficient to furnish [the plaintiffs] with such amounts thereof as [the plaintiffs] may desire to purchase from [the defendants]." The defendants own and maintain the underground tanks. The plaintiffs are licensed to withdraw from the tanks as much motor fuel as the plaintiffs may wish to purchase at the retail price, which is set by the defendants, less nine cents per gallon. Title to the motor fuel stored within the tanks remains with the defendants until the plaintiffs withdraw the fuel from the tank. Withdrawal by the plaintiffs constitutes delivery to the plaintiffs of the quantities of motor fuel withdrawn, and title to that quantity of fuel passes to the plaintiffs. The plaintiffs have no right to prepay for any quantities of motor fuel that the plaintiffs may anticipate selling; nor do the plaintiffs have any rights or obligations with respect to the fuel stored in the underground tanks.

At first blush, it seems that the plaintiffs do "purchase" motor fuel from the defendants. Indeed, the Agreement states several times that the plaintiffs "purchase" the motor fuel from the defendants. Moreover, title to the motor fuel passes from the defendants to the plaintiffs immediately upon its withdrawal from the underground storage tanks. The parties agree that title passes a second time, this time from the plaintiffs to the ultimate

Notification under this section—
(1) shall be in writing;
(2) shall be posted by certified mail or personally delivered to the franchisee; and
(3) shall contain—
(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor;
(B) the date on which such termination or nonrenewal takes effect; and

(C) the summary statement prepared under subsection (d) of this section."

4. The plaintiffs do not argue that they could properly be considered either a "refiner" or a "distributor." *See Johnson v. Mobil Oil Corp.,* 553 F.Supp. 195, 198 (S.D.N.Y.1982) ("the legislative history makes clear that in defining a 'distributor' ... Congress had in mind an independent middleman acting as a jobber, not a dealer selling to the public at retail").

customer, once the fuel is pumped into the customer's automobile. Thus, under the plain language of the Agreement, title to the motor fuel is held by the plaintiffs for the brief period beginning when the fuel leaves the underground storage tanks, during the time it travels through the fuel pump and ending upon placement in the customer's fuel tank. The defendants argue that the use of the word "purchase" in the Agreement and the ephemeral passage of title to the fuel to the plaintiffs is insufficient to establish that the plaintiffs actually "purchased" the motor fuel as intended by the Act. By contrast, the plaintiffs suggest that the language of the Agreement and that passage of title, regardless of duration, is enough to establish the plaintiffs as "purchasers" of motor fuels under the Act.

The parties have not cited, and the court has not discovered, any authority in this circuit on point. Moreover, none of the cases from other circuits cited by the parties, confronts the situation presented in this case: an agreement between the parties which states explicitly that the station operator "purchases" the motor fuel and "title thereto shall then pass" to the operator. *See Farm Stores, Inc. v. Texaco, Inc.,* 763 F.2d 1335, 1337 (11th Cir.1985) (title to the gasoline remains with distributor until sold to customers); *Dunlap v. Schrader Oil Co.,* 758 F.Supp. 633, 634 (D.Co.1991) (same); *Miller v. W.H. Bristow, Inc.,* 739 F.Supp. 1044, 1048 (D.S.C.1990) (same); *Sigmon v. Widenhouse Service, Inc.,* 638 F.Supp. 808, 809 (M.D.N.C.1986) (same); *Automatic Comfort, Corp. v. D & R Service, Inc.,* 620 F.Supp. 1349, 1354 (D.Conn. 1985) (same). *See also, Sanna v. Friendly Service Stations, Inc.,* 593 F.Supp. 493 (D.Conn.1983) (issue of title not mentioned); *Johnson v. Mobil Oil Corp.,* 553 F.Supp. 195 (S.D.N.Y.1982) (same). These

cases identify "factors" for a court to examine in determining whether a particular station operator "purchases motor fuel" and thereby meets the statutory definition of "retailer," "beyond the label the parties attach[ ] to the relationship." *Sanna,* 593 F.Supp. at 498. For example, in *Farm Stores,* the Eleventh Circuit in deciding that the station operator there was not a retailer, considered the facts that the station operator did not (1) pay for the motor fuel inventory until it was sold; (2) pay ad valorem taxes on the motor fuel inventory; (3) bear the risk of loss of the motor fuel; (4) retain any funds from the sale of motor fuel to motorists; (5) set the price or assume the market risk in fluctuations in motor fuel prices; or (6) hold a gasoline retailers business license. *See Farm Stores,* 763 F.2d at 1340. The Eleventh Circuit also considered the fact that the station operator did not "take title" to the motor fuel. *Id.* Other cases have adopted these criteria and also have identified additional, although related, factors. *See Sigmon,* 638 F.Supp. at 811 (station owner did not determine what type of motor fuel purchased); *Automatic Comfort, Corp.,* 620 F.Supp. at 1354 (station operator did not pay fixed price for motor fuel or insure gasoline inventory).

■ Applying the *Farm Stores* and other factors to this case, I conclude that a large number weigh in favor of the defendants' position. The plaintiffs do not pay for the motor fuel before it is sold. The plaintiffs do not control the retail price and do not assume the substantial risk of market fluctuations in retail motor fuel prices. Instead, the plaintiffs collect the monies paid by customers and withhold a $.09 per gallon commission, regardless of the retail price at which the motor fuel is sold.[5] The

---

5. Of course, a per gallon payment arrange-

ment is not completely insulated from market

plaintiffs do not hold a license to sell motor fuel at the Newton location. They do not determine what motor fuel to purchase. The plaintiffs bear no risk of the loss of any motor fuel stored in the underground tanks. The plaintiffs do not pay a fixed price for the motor fuel. The amount owed to the defendants is based on volume of motor fuel sold, not volume delivered. The plaintiffs do not insure the motor fuel inventory or pay ad valorem taxes on that inventory.

On the other hand, the plaintiffs do take title to the motor fuel as it passes through the pump and hold title until the fuel is deposited in the customers car. As a result, the plaintiffs are financially accountable for bad checks, customers who drive away without paying, accidentally spilled motor fuel and credit card chargebacks.

Had the Agreement between the parties not transferred title to the motor fuel from the defendants to the plaintiffs, this case could easily be resolved in favor of the defendants. The fact that title does pass to the plaintiffs, albeit briefly, gives me pause. While other jurisdictions identify the passage of title as only one of many factors to be considered when determining whether a station operator "purchases motor fuels," the parties rightly acknowledge that the transfer of title weighs heavily in the calculus. Close examination of the circumstances in this case makes clear that title passes to the plaintiffs substantially in name only, without most of the true incidences of title. For example, the plaintiffs are not free to "resell" the motor fuel to the customer at any price, but must sell the fuel at the price dictated by the defendants. Nor do the plaintiffs pay taxes on the fuel or hold a license to sell the fuel at

the Newton station. The fact that the plaintiffs do bear some limited risk of loss does not persuade me that title passes to the plaintiffs to a sufficient degree to tip the balance in the plaintiffs' favor, particularly in view of the other factors noted above that weigh against characterization of the plaintiffs as retailers. Thus, having heard the parties' arguments on this issue, and after reviewing the papers submitted in favor of and in opposition to the motion, and the cases cited by the parties, I conclude that the plaintiffs have failed to establish that they "purchase motor fuel." Therefore, the plaintiffs do not fall within the category of persons protected by the PMPA.

### Conclusion

Because the plaintiffs have failed to establish their status as franchisees, their Emergency Motion for Mandatory or Prohibitive Injunctive Relief and Interim Equitable Relief (Docket No. 2) is denied. The defendants have moved for the dismissal of count I of the amended complaint, which alleges a violation of the PMPA, and all other counts of the complaint, which allege violations of state law, for lack of subject matter jurisdiction. As noted above, the parties have treated the defendants' motion as one for summary judgment and so has the court. Based on the reasoning above, defendants' motion for summary judgment is granted with respect to count I of the amended complaint.

■ Because the plaintiffs do not assert any other federal claims or make any allegation of diversity of citizenship, this court's jurisdiction lies in this court's power to hear pendent state law claims. 28 U.S.C. § 1367(c)(3) ("The district courts

---

fluctuations. Increased prices may lower sales volume, and thereby lower revenue derived by the plaintiffs from the sale of motor fuel. However, the plaintiffs collect $.09 regardless of the market price, and their risk with respect to motor fuel sales is limited to the decline in sales overall, as opposed to a decline in the retail price of motor fuel.

*may* decline to exercise supplemental jurisdiction over a claim ... if—(3) the district court has dismissed all claims over which it has original jurisdiction") (emphasis added). *See also, United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725–726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not plaintiff's right"). Considering the fact that the case is in its early stages, as a matter of my discretion I will decline to exercise supplemental jurisdiction over the state causes of action. *See Rodriguez v. Doral Mortg. Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims");

Accordingly, the court orders the following.

(1) The plaintiffs' Emergency Motion for Mandatory or Prohibitive Injunctive Relief and Interim Equitable Relief, dated May 2, 2001, is DENIED. (Docket No. 2).

(2) The defendants' Motion to Dismiss count I of the amended complaint, dated May 7, 2001, is treated as one for summary judgment and GRANTED. (Docket No. 6).

(3) The plaintiffs' second through fifth claims are dismissed without prejudice to their refiling in the state court, to the extent state law and procedure permit.

(4) The Clerk shall enter an order of dismissal of this action

So ordered.