******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PELLEGRINO, J., dissenting. I respectfully disagree with the conclusion reached by my colleagues that the Connecticut Petroleum Franchise Act (petroleum franchise act), General Statutes § 42-133j et seq., does not apply to the business relationship each of the plaintiffs, Branford Quick Mart, LLC, Seaport Quick Mart, LLC, and Dayville Quick Mart, LLC, has with the defendant, Aldin Associates Limited Partnership, because the plaintiffs are not retailers as that term is used in this statutory scheme. In my view, the plaintiffs act as retailers by selling gasoline to members of the general public on the basis of their consignment relationship with the defendant. These relationships stem from the plaintiffs' possession and control of the motor fuels provided by the defendant and their extensive duties and responsibilities to maximize the sale of such products. Furthermore, because the plaintiffs are retailers, they are considered franchisees under the statute, and the defendant acts as a franchisor by distributing motor fuels. See General Statutes § 42-133k (4) and (5).[1] Thus, the parties have entered into a contractual franchise relationship that is the type meant to be regulated under the petroleum franchise act. See General Statutes § 42-133k (1) and (2).[2] Having satisfied these prerequisite conditions, I

[1] General Statutes § 42-133k provides in relevant part: "(4) 'Franchisor' means a refiner or distributor, as the case may be, who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

"(5) 'Franchisee' means a retailer or distributor, as the case may be, who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel."

[2] General Statutes § 42-133k provides in relevant part: "(1) 'Franchise' means any contract (A) between a refiner and a distributor; (B) between a refiner and a retailer; (C) between a distributor and another distributor; or (D) between a distributor and a retailer, under which a refiner or distributor, as the case may be, authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

"(2) 'Franchise' includes (A) any contract under which a retailer or distributor, as the case may be, is authorized or permitted to occupy leased marketing premises, which premises are to be employed in

conclude that the petroleum franchise act applies. See *KennyNick, LLC* v. *Standard Petroleum Co.*, Superior Court, judicial district of Hartford, Docket Nos. CV-09-5042760-S and CV-09-5042762-S (September 12, 2016) (in determining whether petroleum franchise act applies, threshold question is whether parties have franchise relationship), aff'd sub nom. *Standard Petroleum Co.* v. *Faugno Acquisition, LLC*, 330 Conn. 40, 191 A.3d 147 (2018). Accordingly, the plaintiffs are entitled to the protections set forth in General Statutes § 42-133*l*. I therefore would reverse the judgment of the trial court and remand the case for further proceedings.

At the outset, I note my agreement with the majority's apt encapsulation of the facts, procedural history, and historical review of the petroleum franchise act and its relationship with the federal Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 et seq. I add the following details solely to explain why my analysis departs from that of my colleagues. All three plaintiffs leased convenience stores from the defendant and sold motor fuels that it provided. The relationship of the parties as to the sale of such motor fuels is described in both the convenience store leases and the commissioned agent agreements executed by the parties. It is undisputed that the defendant owned the properties where the convenience stores were located and the motor fuels until the motor fuels were sold to members of the general public. Further, the defendant alone was responsible for

connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy; (B) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed (i) under a trademark owned or controlled by a refiner; or (ii) under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and (iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of state law which permits such transfer or assignment without regard to any provision of the franchise. . . ."

setting the price of the motor fuels. The plaintiffs collected the proceeds from the sale of the motor fuels and remitted those funds to the defendant after deducting their commissions from the proceeds.

The convenience store leases provided that, in order for the defendant to terminate its multiyear lease agreements with the plaintiffs, it had to provide the plaintiffs with 120 days' written notice. If, however, the petroleum franchise act applies to the parties, then the parties' contracts would be subject to cancellation or termination only for good cause shown. See General Statutes § 42-133*l* (a). Additionally, under the petroleum franchise act, in the event of termination, the plaintiffs may be entitled to certain compensation at a fair market rate. See General Statutes § 42-133*l* (b). In September and October, 2021, the defendant sent the plaintiffs written notices terminating the convenience store leases and the commissioned agent agreements, effective March and April, 2022. These letters did not provide any reason for the termination of the parties' business relationship. I also note that the stipulation of facts filed by the parties on February 6, 2024, indicated that, on or about January 9, 2023, the defendant doubled the per diem rent charged to each plaintiff.

As stated in the majority opinion, our General Assembly enacted the petroleum franchise act in 1977; Public Acts 1977, No. 77-493, § 1; and Congress passed the PMPA one year later. Petroleum Marketing Practices Act, Pub. L. No. 95-297, 92 Stat. 322 (1978). Both pieces of legislation protect retail sellers of motor fuels from unfair treatment by suppliers due to the economic disparity between these groups. See, e.g., General Statutes § 42-133j (setting forth legislative findings regarding distribution and sale of gasoline and petroleum products and noting, due to inequitable economic power, need to legislate, pursuant to state's police powers, standards governing relationship between suppliers and retailers who sell such products to public); *Farm Stores, Inc.* v. *Texaco, Inc.*, 763 F.2d 1335, 1339 (11th Cir.) (PMPA

was passed to alleviate concerns that franchised sellers of motor fuels could be subjected to unfair treatment by suppliers of such products), cert. dismissed, 474 U.S. 1039, 106 S. Ct. 609, 88 L. Ed. 2d 586 (1985); see generally *Johnson* v. *Mobil Oil Corp.*, 553 F. Supp. 195, 195 (S.D.N.Y. 1982) (PMPA and New York state law counterpart provide procedural and substantive protections to franchised service station operators, including termination of franchise agreements only for cause).

In 1991, our legislature heard testimony from, inter alia, then Attorney General Richard Blumenthal and an attorney representing the Connecticut Gasoline Retailers Association, supporting the expansion of the protections contained in the petroleum franchise act to a greater number of entities. See Conn. Joint Standing Committee Hearings, General Law, Pt. 4, 1991 Sess., pp. 921, 948–51. In amending the petroleum franchise act (1991 amendments), our legislature adopted some, but not all, of the statutory definitions set forth in the PMPA. Relevant to the present case, the definition of the term "retailer" is not included in the petroleum franchise act. Additionally, our General Assembly added the term "consignment" to types of contracts that fell within the definition of a franchise contract in the petroleum franchise act. See General Statutes § 42-133k (2).

In my view, the 1991 amendments to the petroleum franchise act broadened the scope of the statutory protections so as to include entities such as the plaintiffs. I am persuaded by decisions from the Superior Court that have reached this conclusion in similar circumstances. For example, in *Fenix Group, LLC* v. *GPM Investments, LLC*, Docket No. CV-18-6043242-S, 2023 WL 369986, *1 (Conn. Super. January 17, 2023), the court, *Hon. Joseph M. Shortall*, judge trial referee, considered whether the petroleum franchise act applied to consignment relationships between suppliers and service stations. In that case, Fenix Group, LLC (Fenix), and GPM Investments, LLC (GPM), entered into a consignment supply agreement in which GPM agreed to supply Fenix with petroleum

products for sale at premises that were the subject of their sublease agreement. Id.

Fenix sold the motor fuels provided by GPM on a consignment basis pursuant to the terms of their supply agreement. Id. Starting in 2016, Fenix operated a convenience store and sold the motor fuels, receiving a commission of two cents per gallon sold. Id. The business, however, was unsuccessful and ceased operations in March, 2018. Id. Litigation ensued, with Fenix alleging, inter alia, multiple violations of the petroleum franchise act and the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., and breach of contract claims. Id. GPM denied these allegations and filed a multicount counterclaim. Id., *2. Thereafter, GPM moved for summary judgment on all counts of the complaint and the counterclaim. Id.

Similar to the present case, Judge Shortall noted at the outset of his analysis that the central dispute in *Fenix Group, LLC*, was whether the petroleum franchise act applied to the parties. Id. GPM argued that, in order for the petroleum franchise act to apply, Fenix "must have purchased petroleum products from [GPM], not received them under consignment." (Emphasis omitted.) Id. After setting forth the law pertaining to statutory interpretation; see id.; the court explained that the PMPA expressly limited the definition of a "retailer" to entities that had purchased motor fuels for sale to the general public; however, the petroleum franchise act enacted in this state contains no such requirement. Id., *3. Furthermore, the court reasoned that definitions of "'franchise,'" "'franchisor,'" and "'franchisee'" include those relationships that involve the consignment of motor fuels. Id., *4. Ultimately, the court held "that the [consignment] relationship between Fenix and [GPM] constituted a franchise relationship, as defined in § 42-133k (3) . . . . As a result, [GPM] was obligated to conduct itself vis-à-vis Fenix in conformity with § 42-133*l*. Since count one of the complaint alleges that [GPM] failed to do so, [GPM's] motion for summary

judgment must be denied as to count one."[3] (Citation omitted.) Id.

Similarly, in *Seymour Foodmart, LLC* v. *Drake Petroleum Co.*, Docket No. X08-FST-CV-19-6061071-S, 2024 WL 94276, *1 (Conn. Super. January 2, 2024), the court, *Ozalis, J.*, considered the claim of Drake Petroleum Co., Inc. (Drake), raised in its motion for summary judgment, that the parties' 2016 convenience store lease and commissioned agent agreement did not fall within the petroleum franchise act. In that case, Seymour Foodmart, LLC (Seymour), leased a portion of Drake's property for the purpose of operating a convenience store and was appointed as "an agent" for the sale of motor fuels, which were provided solely by Drake. Id., *2. These contracts covered a time period of approximately three years. Id. Drake set the retail price for the motor fuels and paid Seymour a commission on each gallon of motor fuel sold. Id. Seymour paid Drake monthly rent for use of the property as the convenience store. Id. In 2019, Drake offered Seymour a new convenience store lease and commissioned agent agreement but increased the monthly rent and decreased the duration of the lease to one year. Id.

The court considered Drake's argument that, because Seymour did not buy or sell motor fuels, it could not be a "retailer" as that term is used in the petroleum franchise act. Id., *4. Seymour countered, inter alia, that the

---

[3] I acknowledge that, unlike in the present case, Fenix and GPM had entered into a written consignment supply agreement pursuant to which Fenix paid a security deposit for the petroleum products provided by GPM. See *Fenix Group, LLC* v. *GPM Investments, LLC*, supra, 2023 WL 369986, *9. Nevertheless, I agree with the court's analysis and conclusion in that case that an entity that sells motor fuels on a consignment basis is a retailer, i.e., one engaged in the business of selling personal property to the public or consumers, as opposed to those who intend to resell the items, and, therefore, a franchisee under the petroleum franchise act. See id., *4. Furthermore, in my view, the analysis and conclusion set forth in *Fenix Group, LLC*, applies to the present case. I am persuaded, therefore, that, under the facts and circumstances of the present case, the parties have a consignment relationship as to the sale of petroleum products.

definitions of " '[r]etailer' " in General Statutes § 14-327a (4) and " '[r]etail dealer' " in General Statutes § 14-318 (7) supported its claim that the petroleum franchise act applied.[4] Id., *5. The court also considered the legislative history regarding the expanded coverage contemplated by the 1991 amendments to the petroleum franchise act and our legislature's decision to adopt only some of the definitions contained in the PMPA. See id., *5–6. Relying on Judge Shortall's reasoning and analysis in *Fenix Group, LLC* v. *GPM Investments, LLC*, supra, 2023 WL 369986, the court concluded that the petroleum franchise act applied to the relationship between the parties, which involved the sale of motor fuels on a consignment basis. *Seymour Foodmart, LLC* v. *Drake Petroleum Co.*, supra, 2024 WL 94276, *7. Accordingly, it denied Drake's motion for summary judgment as to this count of the complaint. Id.

*Fenix Group, LLC*, and *Seymour Foodmart, LLC,* both stand for the proposition that a business relationship involving the sale of motor fuels on a consignment basis may constitute a franchise contract; see id.; *Fenix Group, LLC* v. *GPM Investments, LLC*, supra, 2023 WL 369986, *4; thus, such relationships fall within, and trigger the protection of, the petroleum franchise act. See generally *Webber Oil Co.* v. *Murray*, 551 A.2d 1371, 1373 (Me. 1988) (where convenience store owner agreed to make Exxon gasoline, which was supplied and owned by distributor, available for sale to public via pumps owned by distributor, and convenience store owner staffed location, sold gasoline, and paid proceeds to distributor subject to commission, such behavior clearly demonstrated

---

[4] Specifically, the court explained: "In addition, [Seymour] directs this court's attention to the definition of 'retailer' in Connecticut's Gasoline and Motor Oil Sales Act, General Statutes § 14-327a (4): 'any person engaged in the business of selling motor fuel to the general public for ultimate consumption' and to the definition of 'retail dealer' in General Statutes § 14-318 (7), which provides: 'any person operating a service station, filing station, store, garage or other place of business for the sale of motor fuel for delivery into the service tank or tanks of any vehicle propelled by an internal combustion engine.' " *Seymour Foodmart, LLC* v. *Drake Petroleum Co.*, supra, 2024 WL 94276, *5.

consignment agreement that fell under Maine's motor fuel distribution and sale statute, and, therefore, distributor was required to provide written notice prior to terminating franchise agreement); *A. Tarricone, Inc.* v. *980 Washington Street Corp.*, 169 Misc. 2d 1072, 1073, 653 N.Y.S.2d 800 (N.Y. App. Term 1996) (consignees were not protected under PMPA but were entitled to protection under New York's motor fuel franchises law).

In the present case, the plaintiffs commenced an action alleging, inter alia, that the defendant violated the petroleum franchise act.[5] They sought damages, a declaratory judgment that the termination of the leases violated the petroleum franchise act, and an injunction prohibiting the defendant from terminating the leases without further court order. The parties subsequently agreed to bifurcate the issue of damages from the plaintiffs' requests for declaratory and injunctive relief and to present the latter by way of a stipulation of facts. The defendant argued that the business relationship of the parties, created by and detailed in their contracts, was not subject to the petroleum franchise act.

I conclude that the relationship between the parties is the type that the petroleum franchise act was meant to regulate. Furthermore, on the basis of the record before me, I am persuaded that the defendant falls within the statutory definition of a franchisor and that the plaintiffs are retailers and, thus, franchisees under the petroleum franchise act. See General Statutes § 42-133k (5). It bears repeating that the term "retailer" is not defined in the petroleum franchise act. It is, therefore, appropriate to consider its common meaning or understanding from a dictionary. See, e.g., *State* v. *Michael R.*, 346 Conn. 432, 459, 291 A.3d 567, cert. denied,   U.S.   , 144 S. Ct. 211, 217 L. Ed. 2d 89 (2023); *Sicignano* v. *Pearce*, 228 Conn. App. 664, 683, 325 A.3d 1127 (2024), cert. denied, 351 Conn. 908, 330 A.3d 881 (2025). "Retailer"

---

[5] Specifically, the plaintiffs alleged that they were "entitled to renewal of their agreements for a term of at least three years as required by . . . § 42-133*l* (c) as well as renewal pursuant to contract."

has been defined as "[a] person engaged in making sales to ultimate consumers. One who sells personal or household goods for use or consumption." Black's Law Dictionary (6th Ed. 1990) p. 1315. I am persuaded that the plaintiffs, by way of their consignment relationship with the defendant, are the entities that sell the defendant's motor fuels to members of the general public and, therefore, are covered by, and entitled to the protections of, the petroleum franchise act.

As previously stated, the business relationships between the plaintiffs and the defendant stem from two separate, yet interwoven documents: the convenience store leases and the commission agent agreements. The former set forth the rights and responsibilities regarding the convenience store businesses. These leases also contained information, obligations, and duties of the plaintiffs regarding the sale of motor fuels to consumers at these locations. The plaintiffs were required to maintain, or pay a third party to maintain, all areas, including the pump islands and gasoline filling areas and to keep them clean and free from obstruction, snow, and ice. The convenience store leases were subject to termination in the event that the commissioned agent agreements terminated or expired. The plaintiffs bore the responsibility for supervising and conducting all of the training of their employees regarding the sale of motor fuels. The plaintiffs' failure to keep the convenience stores open for the hours required would constitute a material interference with the motor fuel operations. Additionally, the plaintiffs were required to fill the window washing stations and paper towels at the pump islands, to clean and ensure the operation of the sinks, faucets and drains, to clear snow and ice from the fuel pumps, islands, gasoline fill areas, air hoses, air stations, and window washing stations, and to pay for the painting of the pump islands. As to the gasoline equipment, the plaintiffs were obligated to conduct weekly safety inspections of the hoses and nozzles, to replace the paper and ribbons, to replace any lost or stolen pump toppers, to repair damage to the dispenser caused by drive offs

in certain circumstances, and to report and clean up any spills of gasoline.

The commissioned agent agreements established that the defendant remained the owner of the motor fuels it had provided until those fuels were sold to retail customers. Each plaintiff agreed "*to use its best efforts to maximize the sale of motor fuels, at retail . . .* [*and bore the responsibility*] *at all times to monitor, supervise, and generally oversee the dispensing of all motor fuel*[*s*] *by each customer.*" (Emphasis added.) Furthermore, the plaintiffs had to ensure that the driveway access and the fuel tank fill caps for the underground storage tanks were kept free from obstruction to allow for delivery of the motor fuels from the defendant. They also had to inform the defendant regarding any defects in quality or quantity variances in regard to the motor fuel deliveries. The plaintiffs were mandated to "utilize the [m]otor [f]uel [e]quipment in a prudent and businesslike manner solely for the purpose of advertising, handling, storing or otherwise facilitating the sale of motor fuels supplied by [the defendant] at each [s]ervice [s]tation." Responsibility for the maintenance, repairs, cleanliness, and replacement of the motor fuel equipment caused by the negligence or fault of the plaintiffs' agents, employees, and customers, unless caused solely by a customer, remained with the plaintiffs. Notably, in the event that a customer drove off without paying for motor fuels that he or she had pumped into their motor vehicle, the plaintiffs bore the sole responsibility for such theft and had to provide the police with a description and the license plate number of the vehicle.[6]

The commissioned agent agreements recognized the need for the plaintiffs to hire employees. All responsibilities for these employees rested with the plaintiffs,

[6] I note that the United States District Court for the District of Massachusetts has that stated that certain federal courts have considered various factors in determining whether a particular station operator meets the definition of a "retailer," including that such an operator "bear[s] the risk of loss of the motor fuel . . . ." *Karak* v. *Bursaw Oil Corp.*, 147 F. Supp. 2d 9, 14 (D. Mass. 2001).

including liability for claims of workers' compensation. The plaintiffs were obligated to train these employees with respect to the operation of the motor fuel business, including daily maintenance, environmental regulations, and spill response. The plaintiffs were required to keep extensive records regarding all motor fuels and to transfer funds from the sale of motor fuels to the defendant. Except for a monthly $30 allowance, the plaintiffs had to reimburse the defendant for any motor fuel or cash shortages.

Furthermore, in order to maintain the service station and to operate it in a prudent and businesslike manner to maximize the sale of motor fuels, the plaintiffs were expected, inter alia, to "clean all dispensers, [to remove] all litter and trash from the premises, [to maintain the] grassed and landscaped areas in an attractive business fashion and [to clean the] restrooms on a daily basis or more often as necessary. Notwithstanding anything contained in the '[c]onvenience [s]tore [l]ease' to the contrary, [the plaintiffs were] responsible for [the] removal of snow and ice from all areas of the [p]roperty and to notify [the defendant] if the hired contractor does not show up as due or does not perform its responsibilities to a satisfactory level." In other words, the plaintiffs conducted "the entire business of selling the motor fuels at the [s]ervice [s]tation[s] . . . ."

After reviewing the obligations and requirements placed on the plaintiffs in the convenience store leases and the commissioned agent agreements, it seems to me that these entities do not merely serve as a conduit for collecting payments from retail consumers purchasing motor fuels and then transmitting those funds to the defendant. The plaintiffs are in possession and control of the motor fuels and most of the circumstances and conditions attendant to the sale of these products. In my view, the plaintiffs sell the motor fuels provided by the defendant on a consignment basis. The plaintiffs' role in conducting the entire business of selling motor fuels evidences such a relationship, which, pursuant to § 42-133k

(2), places their business relationship within the ambit of the petroleum franchise act. See *KennyNick, LLC* v. *Standard Petroleum Co.*, supra, Superior Court, Docket Nos. CV-09-5042760-S and CV-09-5042762-S (court must first determine whether franchise relationship under contract exists in claims brought under petroleum franchise act).

The petroleum franchise act does not define the term "consignment," and, as previously noted, it is therefore appropriate to look to the common understanding of that word. See, e.g., *State* v. *Michael R.*, supra, 346 Conn. 459; *Sicignano* v. *Pearce*, supra, 228 Conn. App. 683. The term "[c]onsignment" has been defined in relevant part as the "[e]ntrusting of goods to another to sell for the consignor. . . . The term 'consignment', used in a commercial sense, ordinarily implies an agency and denotes that property is committed to the consignee for care or sale." Black's Law Dictionary, supra, p. 307. Additionally, the term "[c]onsignment contract" has been defined as "[c]onsignment of goods to another (consignee) for sale under agreement that consignee will pay consignor for any sold goods and will return any unsold goods. A bailment for sale." Id.; see generally *Romeo* v. *Martucci*, 72 Conn. 504, 508, 45 A. 1 (1900) (property that is consigned is bailed and remains in ownership of consignor until disposed of by consignee in pursuance of agency established by fact of consignment). These definitions apply to the parties in the present case.

The plaintiffs, acting through the employees that they must hire and train, are present during the sale of motor fuels to members of the general public. The plaintiffs' employees, not the defendant, assist these customers and ensure that conditions allow for the maximum amount of sales at the gas stations, including by clearing snow and ice from the fueling islands, removing trash, maintaining the restrooms, cleaning and reporting any spills, preventing theft of motor vehicle fuels, and keeping records of the quantity of products sold. Simply put, the defendant has entrusted the motor fuels to the plaintiffs

to sell to the general public on its behalf. Given the role and responsibilities of the plaintiffs in maximizing the sale of motor fuels to the members of the general public, I am convinced that the plaintiffs are retailers and, thus, franchisees under the petroleum franchise act. Accordingly, they are entitled to the protections created by our legislature in § 42-133*l*.

For these reasons, I respectfully dissent.